# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 18, 2008

Charles R. Fulbruge III
Clerk

No. 07-20599

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

IRA KLEIN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, WIENER, and HAYNES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Ira Klein, a physician, treated a number of patients who had contracted Hepatitis C. A jury convicted him of eighteen counts of mail fraud in violation of 18 U.S.C. § 1341 and twenty-six counts of health care fraud in violation of 18 U.S.C. § 1347 for submitting false claims for many of those Hepatitis C treatments. The jury also returned a special verdict finding that Klein had received $10 million in gross proceeds from the fraud underlying his convictions. Klein

was sentenced to 135 months' imprisonment, the bottom of his guideline range, which had been enhanced based on the amount of the loss, the number of victims, the violation of a position of trust, and obstruction of justice. The court ordered restitution. We affirm the convictions but vacate the sentence and remand for resentencing.

I.

The typical Hepatitis C treatment was a forty-eight-week regimen that required three shots of interferon per week and daily ingestion of Ribavirin. The treatments had various side effects that often required administration of various other drugs. Regular blood samples were also taken to monitor the patients' progress.

The patients typically visited Klein's office each Monday, and he or one of his assistants would administer the first of the three interferon shots. During this visit, blood was usually drawn, and the patient was given a week's worth of Ribavirin capsules and two pre-loaded syringes so the patient could self-administer the other two shots during the week. Klein frequently did not collect co-payments for these weekly visits but would submit insurance claims for the office visit, the lab work, the medications, and the administration of the medications.

Two days later, Klein would submit insurance claims for the medication and the administration of the medication that the patients self-administered. Two days after that, he again would submit claims for the self-administered third shot. If the patient received additional medicine to treat side-effects, Klein would file claims for those medications.

When billing for the medications he distributed, Klein did not claim the wholesale price of the drug. A particularly egregious example involved his purchase from the manufacturer of kits that packaged interferon and Ribavirin together. These kits were intended to allow patients easily to self-administer the

drugs at home. Instead of claiming the wholesale price of the kit, Klein broke the kits down, distributed the components, and charged the insurance companies for the separate prices of the components. For example, in at least one instance Klein purchased the kit for approximately $780 but billed the insurance companies $3,840 for providing the medications and administering the injections.

In addition to claims for self-administered medications and for above-wholesale drug prices, Klein "up-coded" for certain procedures. For example, he would submit claims for routine venipunctures coded as though the procedure required a physician's skills, instead of using the code for routine venipuncture. He also used the code appropriate for a detailed examination when the actual exam was a brief check-up. There was also evidence that he filed the same claim for the same patient with multiple "primary" insurers.

The government presented the testimony of Don McWhorter, an investigator with the Texas Department of Insurance, to establish the amount of Klein's fraud. McWhorter concluded that Klein had fraudulently billed $16,124,833.06 and received $10,210,777.04 from the insurance companies. McWhorter based his testimony on patient interviews and an extensive review of Klein's patient records and insurance billing records and the insurance companies' records.

McWhorter calculated the amount of Klein's intended fraud by totaling the amount billed for patients on days for which there were no progress notes in the patient's file. In other words, McWhorter took the absence of a progress note as evidence that the patient did not visit Klein's office and therefore received no treatment, rendering Klein's claim to the insurance company fraudulent. McWhorter did not offset the total intended fraud by the value of the medications self-administered on those days.

The district court sentenced Klein based on a total offense level of 33 and a criminal history category of I. The Presentence Report ("PSR") began with a base offense level of 7, then increased the offense level by twenty based on the

amount of the intended loss, $17,504,840.97.[1] The PSR added two levels because there were more than ten victims (the nineteen insurance companies) and two levels for violating a position of trust in relation to the insurance companies. The PSR did not add two levels for obstruction of justice, so the total offense level was 31, with a range of 108 to 135 months' imprisonment.

Following argument from the parties, the court adopted the PSR but found that Klein had obstructed justice and therefore added the two-level enhancement. With a new offense level of 33, Klein's range was 135 to 168 months. The court sentenced him to the bottom of the range.

The obstruction enhancement resulted from a series of events: After being indicted, Klein was released on bond. During this time, his wife said she intended to divorce him. Believing she had traveled to their home in Florida, Klein flew there and, not finding her at home, set the house on fire. He was trapped in the garage, had to be rescued, and was subsequently arrested and charged with arson. The court revoked his bond, and he was put into a federal detention center.

While there, Klein spoke with several inmates about the possibility of hiring someone to kill his wife and, if necessary, her parents and a friend. He also discussed having the prosecutor (the "AUSA") and the FBI agent on his case murdered. After Klein spoke with two inmates, they reported the conversations to the FBI. An undercover agent then posed as the cousin of one of the inmates and as someone who could arrange the murders. In two recorded conversations, Klein indicated a desire to go ahead with the murder of his wife (and parents and friend, if necessary) to prevent her from testifying at a deposition in their divorce proceedings. He expressly told the undercover FBI agent not to touch

---

[1] This amount is the sum of McWhorter's estimate and two additional claims: one for $323,000 made by the Sheet Metal Workers Local 54 Health and Welfare Fund and the other for $1,057,007.91 made by IBEW-NECA Southwestern Health and Benefit Fund ("SHBF").

the AUSA or the FBI agent until he directed them to do so. Apparently, to avoid suspicion, Klein did not want them harmed too close in time to his wife's death. At some point, he wired $250,000 to an account set up to finance the assassinations.

The PSR did not include the enhancement for obstruction of justice, because the probation officer believed that the threats against Klein's wife were not attempts to obstruct justice in light of the fact that she was not noticed as a potential witness in Klein's criminal trial at that time. With respect to the AUSA and the FBI agent, the probation officer concluded Klein had merely discussed killing them but had not taken affirmative steps toward their murder; the affirmative steps Klein did take were directed toward his wife's death, which was not related to his indictment.

Finally, the court ordered Klein to pay $11,590,784.95 in restitution. The court based this amount on McWhorter's calculation and additional claims by the Sheet Metal Workers Local 54 Health and Welfare Fund and SHBF.

## II.

Klein contends that the court erred by refusing two of his proposed jury instructions. First, the court denied an instruction defining a "scheme to defraud" as one that is "reasonably calculated to deceive persons of ordinary prudence and comprehension." Second, the court declined an instruction that named as a specific element of health care fraud that the victims, the health insurance companies, must have affected interstate commerce.

> We review alleged error in jury instructions for an abuse of discretion, reversing only when the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations. A district court abuses its discretion in omitting a requested jury instruction only if the requested language (1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in

the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense.

United States v. Lucas, 516 F.3d 316, 324 (5th Cir. 2008) (internal quotations and citations omitted), petition for cert. filed, 76 U.S.L.W. 3655 (June 2, 2008) (No. 07-1512).

A.

According to Klein, the failure to instruct the jury that a "scheme to defraud" must be "reasonably calculated to deceive persons of ordinary prudence and comprehension" impaired his defense that he acted in good faith and was not attempting to deceive the insurers, but instead that he informed them of how and where he treated his patients. Essentially, Klein's claim is that, though his insurance claims may have been false, they were not calculated to deceive.

The court's instructions detailed the elements of mail and health care fraud: Mail fraud requires, inter alia, that the defendant "knowingly created a scheme to defraud" and "acted with a specific intent to defraud"; health care fraud requires, inter alia, that the defendant executed a scheme to defraud and "acted knowingly and willfully, that is, with intent to violate a known legal duty." The court included that "'intent to defraud' means an intent to deceive or cheat someone." And instead of adopting Klein's proposed instruction for "scheme to defraud," the court used a definition substantially similar to the one in the Fifth Circuit pattern jury instruction: "A 'scheme or artifice to defraud' includes any scheme to deprive another of money, property, or of the intangible right to honest services by means of false or fraudulent pretenses, representations, or promises."

The instruction did not seriously impair Klein's defense that he did not deceive the insurers because they were aware of where and how he treated his patients. Klein's counsel could have used the "intent to defraud" definition given

by the court by arguing that Klein lacked the intent to deceive because the insurers were aware of how and where he treated his patients. The instruction did not mislead the jury or impair Klein's defense.

## B.

Section 1347 makes it a crime to defraud a "health care benefit program," which is defined as "any public or private plan or contract, affecting commerce . . . ." 18 U.S.C. § 24(b). Klein avers that the failure to instruct the jury that affecting interstate commerce is an element of health care fraud under § 1347 mandates that we overturn his convictions for health care fraud, at least where the government cannot prove the error was harmless.

We first address whether affecting interstate commerce is an essential element of the federal crime of health care fraud.[2] We previously have said that it "is probably correct that the jurisdictional element of § 1347 is an essential element of that offense." United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003).[3] In analogous situations, we have held that "affecting commerce" language is an element of the crime that the government must prove beyond a reasonable doubt.[4] In light of our precedent, the affecting-commerce language in

---

[2] Although "health care benefit program," as used in § 1347, is defined as "affecting commerce," § 24(b), instead of affecting interstate commerce, we read "affecting commerce" to require an interstate effect. See United States v. Mann, 493 F.3d 484, 494 (5th Cir. 2007) (reading "affecting commerce" in the Hobbs Act, 18 U.S.C. § 1951, to require an effect on interstate commerce).

[3] We did not definitively hold that "affecting commerce" was an essential element, because we were reviewing for plain error and did not have to answer the question to determine that the district court had not plainly erred. Hickman, 331 F.3d at 443.

[4] See, e.g., United States v. Sealed Appellant, 526 F.3d 241, 243 (5th Cir. 2008) ("[T]he nexus with interstate commerce, which courts frequently call the 'jurisdictional element,' is simply one of the essential elements of [a federal criminal statute]." (internal quotation marks omitted) (alteration in original)); Mann, 493 F.3d at 494-95 (holding that the "affecting commerce" requirement of the Hobbs Act, § 1951, is an essential element of the crime); United
(continued...)

§ 1347 does create an element, which the government must prove beyond a reasonable doubt.[5]

The district court's instruction, however, arguably included the affecting-commerce requirement. Though the court did not expressly identify an effect on commerce as an element, it closely followed its statement of the elements, which included the language "to defraud any health care benefit program," with the definition of such a program: "any public or private plan or contract, affecting commerce, under which any medical benefit . . . ." Furthermore, the court included a general explanation of interstate commerce.

Klein concedes all of this but urges that the failure to include "affecting commerce" as an element misled the jury. We need not decide whether the failure specifically to name "affecting commerce" as an element was error, because Klein's contention that the court abused its discretion fails on the third prong of the test.

Klein made no argument in the district court or now that the denial of his proposed instruction "seriously impair[ed his] ability to present effectively a particular defense." Lucas, 516 F.3d at 324. Klein's failure to brief this issue adequately constitutes waiver. See United States v. Martinez, 263 F.3d 436, 438 (5th Cir. 2001). Additionally, the court's instruction included a discussion of "affecting interstate commerce" such that Klein could have made the only argument that hinges on that elementSSthat the insurance companies did not affect interstate commerce. In light of the latitude given the district court's formulation of jury instructions and Klein's failure to demonstrate how his defense was im-

---

[4] (...continued)
States v. Westbrook, 119 F.3d 1176, 1191 (5th Cir. 1997) (stating that the "government must provide proof of some effect on interstate commerce" to show that the defendants' actions violated a statute that has an "affecting commerce"-like requirement).

[5] See Hickman, 331 F.3d at 443 ("[A] defendant is entitled to have all the essential elements of a charged offense submitted to a jury and proven beyond a reasonable doubt.").

paired, the court did not err by denying the proposed instruction.

III.

Klein argues that there is insufficient evidence of effect on interstate commerce for counts 24 and 26-32. These eight counts concern Klein's treatment of three patients, who he claims were insured by companies that the government failed to prove affected interstate commerce, namely CIGNA Healthplan of Texas ("CIGNA") and Blue Cross/Blue Shield of Texas.

"We review the district court's denial of a motion for judgment of acquittal de novo." United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1993). "Our review for sufficiency of the evidence following a conviction is narrow. We will affirm if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." Westbrook, 119 F.3d at 1189 (citations omitted). "We must consider the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution." Id.

There is more than sufficient evidence from which the jury was entitled to conclude that both of these insurers affected interstate commerce. We note several examples.

There is evidence that CIGNA provided medical benefits to the employees of Scientific Drilling International, and the policy included specific riders for employees living outside Texas.[6] There is also evidence that CIGNA provided benefits for Mariner Post Acute Network, Inc., of Atlanta, Georgia, and the MILA Managed Health Care Trust Fund headquartered in New York, New York.

Additionally, a Blue Cross/Blue Shield of Texas special investigator testified that Blue Cross/Blue Shield of Texas had reciprocal agreements with Blue

---

[6] These riders added to or changed the provisions of the policy in Arkansas, California, Colorado, Louisiana, Mississippi, Nevada, Oklahoma, Washington, and Wyoming.

Cross/Blue Shield entities in other states. The witness explained, by way of example, that if "you're in Michigan and you come to Texas and you have services, they would bill the Texas plan. But the Michigan plan would reimburse Texas for it." From this and other evidence, a rational trier of fact could conclude that CIGNA Healthplan of Texas and Blue Cross/Blue Shield of Texas affect interstate commerce.

IV.

Klein contends that the probation officer, in preparing the PSR, and the court, in adopting it, erred in their calculation of the amount of loss suffered by the victims, the insurance companies. Though we review a sentence for abuse of discretion, Gall v. United States, 128 S. Ct. 586, 597 (2007), we review the district court's application of the guidelines de novo and its findings of fact at sentencing for clear error. See United States v. Olis, 429 F.3d 540, 545 (5th Cir. 2005). An error in applying the guidelines is a significant procedural error that constitutes an abuse of discretion. See Gall, 128 S. Ct. at 597.

The amount of loss calculation should account for "the fair market value of the property returned and services rendered, by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. 3(E)(i). The PSR primarily relied on McWhorter's testimony and calculations in determining the amount of intended loss. The PSR's loss calculations exactly match McWhorter's except for the addition of the claims made by the Sheet Metal Workers Local 54 Health and Welfare Fund and SHBF.[7]

---

[7] The PSR also reallocated $17,680.22 in loss from Blue Cross/Blue Shield of Texas and $631,628.34 in loss from the Mail Handlers Benefit Plan to the Office of Personnel Management ("OPM"), the agency that administers the Federal Employees Health Benefit Plan. Blue Cross/Blue Shield of Texas and the Mail Handlers Benefit Plan paid the respective amounts to Klein for services rendered to federal employees. OPM, in turn, reimbursed Blue Cross/Blus Shield of Texas and the Mail Handlers Benefit Plan.

McWhorter led the investigation of Klein for the Texas Department of Insurance and testified that he calculated the amount of intended loss by totaling the amount billed by Klein for patients on days for which there were no progress notes in the patient's file. McWhorter took the absence of a progress note as evidence that the patient had not visited Klein's office and therefore received no treatment. Thus, McWhorter concluded the total billed on those days was fraudulent. He acknowledged that, on those days, Klein's patients self-administered various drugs Klein had dispensed, but McWhorter's calculation did not credit Klein for the value of those drugs.

No one disputes that the patients needed those drugs and that the insurers would have had to pay for the drugs had Klein merely written prescriptions. Thus, Klein contends the PSR overstates the amount of loss, and we ought to vacate his sentence and remand for the district court to calculate the amount of loss properly.

The government concedes that the amount of loss adopted by the court does not give Klein credit for the value of the drugs his patients self-administered.[8] The government, however, characterizes the loss amount as a finding of fact that we ought to review for clear error. Furthermore, it contends that the court need only have made "a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. 3(C). And, because "[t]he sentencing judge is in a unique position to assess

---

[8] At oral argument, the government asserted that Klein was effectively given credit for the drugs dispensed on days in which patients did not visit his office, because he was given full credit for the services provided on days in which there were progress notes in the patients' files, services that included over-priced, unbundled kits. According to the government, the Rebetron kits cost Klein approximately $780 wholesale, but after he unbundled the kits he charged the insurance companies approximately $3,840 for the same medications.

McWhorter gave Klein credit for the medication dispensed on the day the patient came to the office, or $1,560, but not for the $2,280 charged for the remaining medication. Thus, the credit for the $1,560 more than covered the $780 Klein should have received. Unfortunately, there is no evidence that McWhorter calculated the loss thus, nor is there evidence the PSR or the court made that calculation.

the evidence and estimate the loss based upon that evidence," his finding should be given deference. Id.

The government is correct that the finding as to the amount of loss is a factual finding, and we cannot reassess the evidence but owe the finding deference. We can, however, consider de novo how the court calculated the loss, because that is an application of the guidelines, which is a question of law. United States v. Saacks, 131 F.3d 540, 542-43 (5th Cir. 1997). In fact, before assessing the court's loss estimate, we "first determine[] whether the trial court's method of calculating the amount of loss was legally acceptable." Olis, 429 F.3d at 545 (citing Saacks, 131 F.3d at 542-43; United States v. Krenning, 93 F.3d 1257, 1269 (5th Cir. 1996)). And, though the factual finding is entitled to deference, the amount of "[l]oss shall be reduced by . . . the fair market value of the . . . the services rendered, by the defendant . . . to the victim before the offense was detected."[9] U.S.S.G. § 2B1.1 cmt. 3(E)(i) (emphasis added).

Nonetheless, the government claims that the court was justified in finding $17,504,840.97 a reasonable estimate of Klein's intended loss in light of the whole record. Implicit in this argument is the assertion that McWhorter's approximation did not capture the full extent of the fraud. Thus, even applying the discount for medications provided, the court was still justified in concluding the amount of loss was approximately $17 million.

Certainly the court could have reached that conclusion, but it did not. It adopted the PSR, which accepted McWhorter's calculation that did not offset the amount of loss by the value of the drugs dispensed as the guidelines direct.

---

[9] This raises an additional issue for the district court, because the guidelines define detection as the earlier of (1) the time the offense was discovered by the victim or government agency or (2) the time the defendant should have known the offense was detected or about to be detected. U.S.S.G. § 2B1.1 cmt. 3(E)(i). There is evidence that several of the insurers were aware of Klein's unbundling of the drug kits and directed him to write prescriptions instead. It seems that from this point forward, Klein would not receive a credit for the drugs dispensed.

Finally, the government argues that it was a violation of state law for Klein to dispense drugs as he did, and he ought not get the benefit of a reduction in the amount of intended loss for his illegal behavior. Obviously, Texas is free to prosecute him for illegally dispensing drugs, and the district court is free to consider that behavior in exercising its sentencing discretion, but it has no bearing on the "reasonably foreseeable pecuniary harm" suffered by the insurance companies. See U.S.S.G. § 2B1.1 cmt. 3(A)(i).

A straightforward application of the guidelines requires discounting the actual loss by the value of the drugs dispensed.[10] The failure to do so resulted in an improper guidelines calculation, which is a procedural error under Gall, 128 S. Ct. at 597, that constitutes an abuse of discretion. Thus, we vacate the sentence and remand for resentencing.[11]

## V.

Klein urges the same argument regarding the court's restitution order that he made regarding the amount of loss calculation: It should have been discounted by the value of the drugs actually dispensed for self-administration. "We review the legality of restitution awards de novo, and if the award is legally permitted, we review the amount for abuse of discretion." United States v. Mann, 493 F.3d 484, 498 (5th Cir. 2007).

---

[10] The amount of the offset is determined by what the insurance company would have paid for the medicine, not what Klein paid. As an example, the PSR notes that SHBF calculated its loss by subtracting the average wholesale price of the drugs provided by Klein from what Klein received from SHBF.

[11] Klein also urges that we vacate his sentence because the AUSA, who was one of the targets of his attempt to hire a hitman while at the federal detention center, argued at sentencing for the application of a two-level obstruction-of-justice enhancement. Klein contends the AUSA was not an impartial prosecutor representing the government but instead had his own interests at stake. We need not reach this in light of our conclusion that the court erred in calculating the guidelines range. If the AUSA involved at sentencing is not involved at resentencing, the need for our further examination of this issue will be obviated. We express no view on whether Klein obstructed justice.

> An order of restitution will be reversed on appeal only when the defendant shows that it is probable that the court failed to consider a mandatory factor and the failure to consider the mandatory factor influenced the court. The Court's failure to follow the statutory requirements is reviewed for abuse of discretion.

United States v. Reese, 998 F.2d 1275, 1280-81 (5th Cir. 1993) (citation omitted). The failure to follow an applicable statute is always an abuse of discretion.[12]

The court ordered restitution pursuant to the Mandatory Victim's Restitution Act ("MVRA"), 18 U.S.C. § 3663A, under which "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court . . . ." § 3664(f)(1)(A) (emphasis added). It is the defendant's burden to demonstrate that the court likely did not consider a mandatory factor and that that failure affected the order of restitution. Reese, 998 F.2d at 1280-81.

Klein has met that burden and has demonstrated that the court did not consider the victims' loss but instead considered Klein's gross from the fraud. Given that it is not disputed that the insurance companies would have had to pay for the medications regardless of the fraud, Klein's gross is not equivalent to the insurers' loss. Thus, the failure to consider the victims' loss influenced the restitution order and is an abuse of discretion. We vacate the restitution order and remand for the court to consider the victims' loss.

In summary, we AFFIRM Klein's convictions, VACATE his sentence and the restitution order, and REMAND for resentencing.

---

[12] United States v. Delgado-Nunez, 295 F.3d 494, 496 (5th Cir. 2002) ("[A]buse of discretion review of purely legal questions . . . is effectively de novo, because '[a] district court by definition abuses its discretion when it makes an error of law.'" (quoting Koon v. United States, 518 U.S. 81, 100 (1996) (second alteration in Delgado-Nunez))).