# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
May 14, 2020

Lyle W. Cayce
Clerk

No. 19-10400

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

PAUL EMORDI; LOVETH ISIDAEHOMEN; CELESTINE OKWILAGWE, also known as Tony Okwilagwe; ADETUTU ETTI,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before SOUTHWICK, COSTA, and DUNCAN, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The four defendants were indicted for conspiracy to engage in Medicare and Medicaid fraud in their operation of a home healthcare business, continuing over a period of three years and causing over $3.5 million in losses. All four were convicted after a jury trial. On appeal, two of the defendants are challenging the sufficiency of the evidence, while the other two complain about the validity of their sentences. We AFFIRM as to all defendants and claims.

No. 19-10400

FACTUAL AND PROCEDURAL BACKGROUND

In 2001, Celestine Okwilagwe and Loveth Isidaehomen, who are husband and wife, started a home health business called Elder Care Home Health Services, LLC ("Elder Care"). They approached their friend, Gloria Ogabi, to ask for permission to use her name in establishing the new business. Ogabi "didn't think much about it" and agreed. Eventually, Okwilagwe came to Ogabi's residence and asked Ogabi to sign paperwork, including the Elder Care articles of incorporation. Ogabi did not know why Okwilagwe and Isidaehomen needed her signature, but she signed because Isidaehomen was "like a sister." Later in 2001, Ogabi signed board meeting minutes reflecting the resignations of Okwilagwe and Isidaehomen as Elder Care managers. Ogabi, though, never participated in board meetings. Ogabi also signed Elder Care's initial application to become a Medicare provider, listing herself as Elder Care's owner despite having no ownership in the company. According to tax records from 2011 to 2014, Okwilagwe and Isidaehomen remained Elder Care's owners.

In 2007, Ogabi began to worry about her name being on the Elder Care documents. She asked Okwilagwe and Isidaehomen to remove her name, and they falsely told her they did so. Elder Care continued to use Ogabi's name as the company's owner in applications for Medicare revalidation. Elder Care also used Ogabi's name as the owner on its 2008 and 2015 ownership disclosure forms submitted to the Texas Department of Health and Human Services, which at the time was known as the Department of Aging and Disability Services ("DADS"). Ogabi's name continued to be used as Elder Care's owner on its 2015 recredentialing application to Molina Healthcare of Texas, a managed-care organization contracting with the state of Texas to provide Medicaid services in Texas, and to which Elder Care had to apply in order to bill Medicaid.

2

No. 19-10400

In 2012, the Texas Department of Health and Human Services Office of Inspector General sent letters to Okwilagwe and Paul Emordi, co-defendant here, informing them that they were "being excluded from participation in any capacity in Medicare, Medicaid, and **all** Federal health care programs . . . for the minimum statutory period of 5 years." (bold and underline in original). These exclusions resulted from Okwilagwe and Emordi's pleas of guilty to attempted theft arising from Medicaid fraud. Isidaehomen had been indicted as a result of these same events, but her indictment was dismissed. Okwilagwe and Emordi both appealed their exclusions, but neither appeal was successful.

Okwilagwe admits that he "continued to operate [Elder Care], under a straw owner named Gloria Ogabi." Emordi acknowledges that he knew he should not have been working at Elder Care while he was excluded. Three days after Okwilagwe and Emordi's exclusions became effective, Isidaehomen became an authorized signer on the Elder Care bank account ending in the number 2858, the account into which Medicaid payments were deposited. Isidaehomen also became the primary signer of checks issuing from that account and from Elder Care's bank account ending in the number 9574, into which Medicare payments were deposited. Isidaehomen began writing checks to Emordi's wife, Mosunmola, and stopped writing checks to Emordi. FBI agent Diana Hernandez testified that she discovered no evidence that Mosunmola worked for Elder Care, though Hernandez remembered there had been "someone" who had mentioned that Mosunmola had worked at Elder Care at an undisclosed time.

According to Hernandez, Okwilagwe stated that he stayed on as the manager and director of Elder Care and paid the employees and paid the bills. During the exclusion period, Elder Care continued to bill Medicare and Medicaid. According to FBI auditor Crystal Garcia, Elder Care received more than $3.5 million from Medicaid and Medicare during the exclusion period. In

No. 19-10400

the company's 2015 renewal application with Molina Healthcare, co-defendant Adetutu Etti — Nursing Director for the company — certified that Elder Care did not "currently employ any person who has been or is currently excluded from participation in a government program (*e.g.*, Medicare, Medicaid)." In an Elder Care contract renewal with Superior Healthplan, another managed-care organization similar to Molina Healthcare, Etti certified that Elder Care had never been excluded from participation in a federal or state healthcare program. A Superior Healthplan representative testified that Elder Care affirmed in its contract renewal that it had not hired and would not hire anyone who had been so excluded. That witness also stated that Elder Care affirmed it would continuously check to make sure their employees had not been excluded. In Elder Care's 2015 re-enrollment as a home health services agency for DADS, Etti certified that Elder Care and its principals (defined as including an "officer, director, owner, partner") were not excluded from participation in Medicare, Medicaid, or any federal or state healthcare program.

In June 2015, pursuant to Medicare's regular recertification process, DADS surveyor Glory Lutrick found discrepancies in Elder Care's patient files, completed a suspected provider fraud form, and referred the case for further investigation. The FBI's investigation uncovered Okwilagwe's involvement with Elder Care through franchise documents filed with the Texas Secretary of State that listed him as an Elder Care "officer, director, or member" from 2007 to 2010 and from 2013 to 2015. The FBI learned of Emordi's role through surveillance, interviews, and its review of company bank records.

When FBI agents went to Elder Care during the investigation, they saw Emordi's vehicle in the parking lot. When they asked the office manager if Emordi was there, she told them he was not. At that moment, the agents saw Emordi stand up and start to walk away, but they called his name and he came to them. When they asked Emordi about his exclusion, he initially said he

4

knew nothing about it but then recalled his appeal. Emordi stated that Etti owned Elder Care. During the FBI's 2016 investigation, agents also interviewed Okwilagwe and Isidaehomen, who then attempted to contact Ogabi for the first time since 2012.

Okwilagwe, Emordi, Etti, and Isidaehomen were indicted for conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347 and 1349 (Count I). Okwilagwe and Etti were each indicted on two counts of making false statements in "health care matters," in violation of 18 U.S.C. § 1035, based on various filings such as Elder Care's Molina Healthcare renewal application (Count II) and its June 2015 statement for the DADS disclosure of ownership form (Count III), each of which stated that Ogabi was the sole owner of Elder Care. All defendants pled not guilty. At their joint trial, the prosecution presented more than 150 exhibits and 12 witnesses. The jury found all defendants guilty on all counts.

At the sentencing hearing, the district court adopted the presentence report ("PSR"). The court found an intended loss amount of $3,733,272.40 based on the amounts that were billed to Medicare and Medicaid. To calculate Okwilagwe's advisory range under the Sentencing Guidelines, the district court adopted the PSR's base offense level of 6 under U.S.S.G. § 2B1.1(a)(2). It then added 18 levels under Section 2B1.1(b)(1)(J) for the intended loss between $3.5 million and $9.5 million and 2 levels under Section 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims. After several other enhancements not at issue here, the district court arrived at a total offense level of 36, which, combined with a criminal history category of I, produced a range of 188 to 235 months.

Okwilagwe objected to the Section 2B1.1(b)(2)(A)(i) enhancement for an offense that involved 10 or more victims, and the Section 2B1.1(b)(1)(J)

enhancement for intended loss between $3.5 million and $9.5 million. These objections were overruled.

After expressing concern that Okwilagwe was the "mastermind" who was "running the whole show," and who concealed his conduct from 2001 to 2016 but nevertheless claimed he had done nothing wrong, the district court imposed a sentence of 188 months.

The district court ordered $3,559,154.22 in restitution to Medicare and Medicaid pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"). Okwilagwe objected to the restitution amount, and the district court overruled the objection.

As to Etti, the district court adopted the PSR. Based on an offense level of 30 and Etti's criminal history category of I, the court calculated an advisory Guidelines range of 97 to 120 months. Etti requested a downward departure to a total of less than 60 months, and the Government requested a within-Guidelines sentence. The court imposed a sentence of 85 months. After the sentence was announced, Etti's counsel stated, without elaboration: "Your Honor, just for record purposes, we object to the sentence."

For both Emordi and Isidaehomen, the court calculated a sentencing range at 97 to 120 months. Emordi was sentenced to 60 months and Isidaehomen to 97 months.

All four defendants timely appealed.

## DISCUSSION

Both Emordi and Isidaehomen claim there was insufficient evidence to support conviction but make no complaint about the sentencing. Etti and Okwilagwe, on the other hand, challenge only their sentences. We first will review the evidence for conviction, then turn to the sentencing issues.

No. 19-10400

I.    *Sufficiency of evidence as to Emordi*

Emordi moved for a judgment of acquittal, so we review the sufficiency of the evidence *de novo*.  *United States v. Perez-Ceballos*, 907 F.3d 863, 866–67 (5th Cir. 2018).  This review, though, is "highly deferential to the verdict.  The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Kuhrt*, 788 F.3d 403, 413 (5th Cir. 2015) (citation omitted).  We ask only if the verdict was reasonable, not whether it was correct.  *Id.*  Nonetheless, it should not stand if the Government has merely "pile[d] inference upon inference to prove guilt."  *United States v. Waguespack*, 935 F.3d 322, 330 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 827 (2020).

Emordi was charged with conspiracy to commit healthcare fraud under 18 U.S.C. §§ 1347 and 1349.  The elements of healthcare-fraud conspiracy are (1) the existence of an agreement between two or more people to pursue the offense of fraud;  (2) knowledge of the agreement;  and  (3) voluntary participation.  *See United States v. Barson*, 845 F.3d 159, 163 (5th Cir. 2016).  Knowledge and voluntary participation may be inferred from surrounding circumstances and a defendant need not have been the one to have personally submitted the necessary forms to be guilty.  *Id.* at 163–64.

Emordi argues the evidence was not sufficient to support the jury's finding that he knew of and voluntarily joined the conspiracy.  Essentially, Emordi argues the evidence showed only that the other defendants carried out the conspiracy, not that Emordi knew about it or was involved.  According to Emordi, the evidence established that he did nothing to conceal his role at Elder Care but instead simply showed up to work and received paychecks.

The Government, though, identifies evidence that Emordi knew he was excluded from working at a Medicare/Medicaid provider.  Evidence of that

7

knowledge supported that he must also have known his working at Elder Care was in some way being concealed. This knowledge, combined with Okwilagwe's and Etti's undisputed concealment of Emordi's role, demonstrates concerted action from which a reasonable jury could conclude there was no reasonable doubt that Emordi knew of and joined in the conspiracy. The Government also discusses that almost immediately after Emordi and Okwilagwe were excluded for the same underlying fraudulent conduct, payments from Elder Care started to be made to Emordi's wife instead of to him, and that he was evasive during the FBI investigation.

Emordi conceded he was excluded and should not have been working at Elder Care. The evidence we have summarized was sufficient for a reasonable jury to find, as this one did, that Emordi knew of and joined the conspiracy.

## II.    *Sufficiency of evidence as to Isidaehomen*

Isidaehomen moved for a judgment of acquittal, causing us to review the sufficiency of the evidence *de novo*. *Perez-Ceballos*, 907 F.3d at 866–67. We have already articulated the highly deferential review standard to be applied. *See Kuhrt*, 788 F.3d at 413.

Isidaehomen, like Emordi, was charged with healthcare-fraud conspiracy under 18 U.S.C. §§ 1347 and 1349, so the required elements for conviction are the same. Isidaehomen also challenges only the sufficiency of the evidence as to her knowing of and voluntarily joining the conspiracy. She argues that it was her husband Okwilagwe who went to Ogabi to obtain signatures on the company's founding documents as an owner. Isidaehomen also argues there was no evidence that she was aware of her husband's or Emordi's exclusions. She also insists that her being shown as the owner along with her husband does not support a finding that she had knowledge of or joined the conspiracy to conceal Okwilagwe's and Emordi's exclusions.

No. 19-10400

We find, though, evidence that supports Isidaehomen's knowledge and voluntary participation: (1) she was indicted in the same state court case that was the basis of Okwilagwe's and Emordi's exclusions; (2) she maintained the relationship with Ogabi and facilitated her husband's having Ogabi sign the company's founding documents; (3) she assured Ogabi in 2007 that Ogabi's name would be removed from those documents; (4) tax records show Isidaehomen had an ownership interest from 2011 to 2014; (5) she became an authorized signer on the bank account to which Medicaid payments were received almost immediately after Okwilagwe's and Emordi's exclusions became effective; and (6) for a time after the exclusions became effective, Isidaehomen began writing checks to Emordi's wife, Mosunmola, and stopped writing checks to Emordi.

The question on appeal is whether any rational trier of fact could have found beyond a reasonable doubt that the Government had through this and other evidence proven the elements of Isidaehomen's crime. *Kuhrt*, 788 F.3d at 413. Jurors were not irrational in finding Isidaehomen knew of and voluntarily joined the conspiracy.

III.   *Sentencing issues as to Okwilagwe*

A.     *Beneficiaries as "victims"*

Okwilagwe objected to his two-level enhancement under Section 2B1.1(b)(2)(A)(i) of the Guidelines for an offense involving 10 or more victims. The preserved objection means we review the district court's interpretation of the Guidelines *de novo* and its factual findings for clear error. *See United States v. Eustice*, 952 F.3d 686, 690 (5th Cir. 2020).

Okwilagwe argues that the only "victims" were Medicare and Medicaid, so there were not 10 or more victims for purposes of Section 2B1.1(b)(2)(A)(i), and the district court thus erred in applying this enhancement. We have

already held that "Medicare beneficiaries for whom the conspirators falsely claimed benefits were 'victims' under the Guidelines" because "[a]pplication Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses the Medicare beneficiaries because it includes 'any individual whose means of identification was used unlawfully or without authority.'" *Barson*, 845 F.3d at 167.   As Okwilagwe discusses, the court has not been unanimous in its conclusion.  *See Barson*, 845 F.3d at 168–69 (Jones, J., concurring in part and dissenting in part) (disagreeing with majority as to meaning of "victim"); *United States v. Ainabe*, 938 F.3d 685, 694–95 (5th Cir. 2019) (Dennis, J., concurring) (disagreeing with *Barson* as to meaning of "victim").

We note Okwilagwe's objection and the disagreement in our precedents, but we are bound by *Barson*.  The district court did not err in imposing this two-level enhancement.

*B.     Loss calculation*

Okwilagwe objected to the enhancement under Section 2B1.1(b)(1)(J) of the Guidelines for an intended loss between $3.5 million and $9.5 million.  We review a district court's method of determining loss *de novo*.  *United States v. St. Junius*, 739 F.3d 193, 214 (5th Cir. 2013).

"[T]he amount fraudulently billed to Medicare/Medicaid is *prima facie* evidence of the amount of loss the defendant intended to cause."  *Id.*  A district court reduces loss by "the fair market value of the property returned and the services rendered . . . to the victim before the offense was detected."  § 2B1.1 cmt. 3(E)(i).  A district court "need only make a reasonable estimate of loss," and given its "unique position to assess the evidence and estimate the loss" amount, its "loss determination is entitled to appropriate deference."  § 2B1.1 cmt. 3(C).

Okwilagwe argues that he overcame the presumption that the amount billed to Medicare and Medicaid was the intended loss.  During sentencing

No. 19-10400

though, Okwilagwe argued that he had no burden to produce evidence Elder Care had rendered legitimate services. Okwilagwe offered no evidence to show that the amount billed overstated his intent. *See St. Junius*, 739 F.3d at 214.

Nevertheless, Okwilagwe argues that because Elder Care provided at least some appropriate medical services to patients, the district court erred by not subtracting the value of these services from its total loss calculation. He relies on a precedent in which we held a district court erred by not discounting the fair market value of dispensed medications from its loss calculation. *United States v. Klein*, 543 F.3d 206, 213–14 (5th Cir. 2008). In *Klein*, though, the defendant had overbilled and coded procedures incorrectly. *Id.* at 208–09. The court there recognized that no party disputed "that the patients needed those drugs and that the insurers would have had to pay for the drugs had [the defendant] merely written prescriptions." *Id.* at 213. In contrast here, had Medicare and Medicaid been aware of Okwilagwe's involvement with Elder Care, they would not have paid any of the claims because of his exclusion.

Okwilagwe analogizes to another case where the district court erred by not reducing the loss calculation by the value of legitimate services. *United States v. Mahmood*, 820 F.3d 177 (5th Cir. 2016). "Medicare would have reimbursed [the defendant's] hospitals $430,639 if the claims had been submitted without [the defendant's] fraud." *Id.* at 194. The court recognized that if Medicare had known of the defendant's fraud, it "would not have paid for the services that [the defendant's] hospitals rendered to patients," and if that had been the case, then the defendant would have been "entitled to no such credit" for the fair market value of those services. *Id.* at 193–94.

We have held that because Medicare only pays for treatments that meet its standards, and services rendered by unlicensed personnel do not meet those standards, Medicare receives no value from those services. *United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011). Similarly, because of the exclusions,

11

Elder Care's services were not legitimate because it did not meet Medicare's and Medicaid's standards, and they would not have paid the claims but for the fraud. So, the district court did not err in its loss calculation.

### C.     Restitution

Okwilagwe also objected to the restitution amount. We review the legality of restitution awards *de novo*; if the award is legally permitted, we review the amount for abuse of discretion. *United States v. Mann*, 493 F.3d 484, 498 (5th Cir. 2007). Restitution is limited to the victim's "actual loss directly and proximately caused by the defendant's offense of conviction." *Mahmood*, 820 F.3d at 196. For healthcare-fraud cases, actual loss does not include any amount an insurer would have paid had the defendant not committed fraud. *Id.*

Okwilagwe argues that if he had not committed the fraud of which he was convicted, Elder Care's patients still would have received treatment from some other Medicare/Medicaid provider, suggesting that Medicare and Medicaid would have paid the same amount even if Okwilagwe had not committed fraud.

The Government responds that Okwilagwe still has produced no evidence to support his argument that his patients received legitimate care. It argues that regardless of whether medical care may have been legitimately claimed by an entity employing no excluded individuals, the correct "actual loss" analysis does not involve the question of whether Medicare and Medicaid might have paid the amount to some other healthcare provider in the absence of Okwilagwe's fraud, but whether Medicare and Medicaid would have paid for the specific services provided by Elder Care absent Okwilagwe's fraud. Because Medicare and Medicaid would not have paid any of the claims in the absence of Okwilagwe's fraud (*i.e.*, if he had not concealed the exclusions), the

Government contends that the district court's calculation of the actual loss based on the amount actually paid was not in error.

The Government's argument convinces. Okwilagwe's conspiracy and false statements regarding the exclusions caused Medicare and Medicaid to treat Elder Care as an eligible provider. The claims would not have been paid, though, if the fraudulent conduct had been known. The district court did not err by using the amount paid by Medicare and Medicaid, which would not have occurred without Okwilagwe's fraud, as actual loss for restitution. *See United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019).

## IV.    *Sentencing issues as to Etti*

Etti argues that her below-Guidelines sentence of 85 months was substantively unreasonable. She also concedes that her objection to her sentence was not based on the specific grounds she now raises, so we review for plain error. *See United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013).

Etti's sentence was below the advisory Guidelines range, so we presume it was reasonable. *See United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). This presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing sentencing factors. *See United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

Etti relies on a district court opinion where the court departed downward from an advisory Guidelines range in sentencing because the defendant, who had falsified certain documents, did not personally receive monetary benefit from the fraudulent scheme other than continued employment, expressed remorse, and seemed to be a law-abiding man who made a poor choice due to family stress, health problems, and pressure from employers. *See United*

No. 19-10400

*States v. Keller*, No. 3:04-CR-233-G, 2005 WL 6192897, *6–7 (N.D. Tex. Oct. 17, 2005).  Etti argues that she too committed fraud merely to stay employed by Elder Care, not because she wanted to defraud the government.  She emphasizes that she has been a law-abiding citizen, has no criminal history, and bore no leadership role in the scheme.  She argues her sentence was not sufficiently different from that of Isidaehomen, who was more culpable yet received a sentence of 97 months, only 12 more months than Etti's 85 months.

The district court considered these arguments and the 18 U.S.C. § 3553(a) factors in its analysis.  Etti's insistence that the district court should have balanced the factors differently does not demonstrate unreasonableness.  *See United States v. Alvarado*, 691 F.3d 592, 597 (5th Cir. 2012).  Etti also has not shown that the district court failed to consider a sentencing factor that should have received significant weight, gave significant weight to a factor it should have discounted, or made a clear error of judgment when it balanced the relevant factors.  *See Cooks*, 589 F.3d at 186.  Thus, she has not rebutted the presumption of reasonableness.

AFFIRMED.