# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1921

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

JAMES J. SCHRECKENGOST,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 4:03CR40062-001-JPG—**J. Phil Gilbert**, *Judge*.

_____

ARGUED SEPTEMBER 23, 2004—DECIDED OCTOBER 8, 2004

_____

Before EASTERBROOK, WOOD, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge*. James Schreckengost re-moved the ink from genuine $5 bills with a chemical solution and used an inkjet printer to produce facsimiles of $100 bills on the blank sheets. These fakes had the feel of cur-rency and could pass some tests employed to identify genuine bills. For example, currency paper has colored threads, a security strip, and a watermark. See the Secret Service's description of these and other features at http://www.secretservice.gov/ money_design_features1990.shtml. Some features of real currency paper depend on the denomination: each security strip contains the value, and the watermark is a shadow of

the bill's portrait. So someone who looked closely at Schreckengost's products would have noticed that the watermark depicted Lincoln rather than Franklin, and that the security strip said $5 rather than $100. Tiny type is hard to read, however, and the difference in the faces may escape notice, so bogus bills on real currency paper are more likely to evade detection than are bills printed on sliced-up foolscap. Two cashiers did notice the difference in Schreckengost's work, however. He was arrested and pleaded guilty to counterfeiting. See 18 U.S.C. §§ 471, 472, 492.

His sentence, 8 months' imprisonment, dissatisfies the Department of Justice, which has appealed. The district court calculated the sentence by applying U.S.S.G. §2B1.1, the generic provision for frauds. According to the prosecutor, however, the district court should have used §2B5.1, which bears directly on counterfeiting. This would have increased Schreckengost's offense level to 15 (as opposed to 6 from §2B1.1(a)), for §2B5.1(b)(3) sets 15 as the minimum for counterfeiting U.S. currency or possessing devices put to that end. Because Schreckengost is in criminal history category IV, the range under the prosecutor's calculation would have been 24 to 30 months' imprisonment. But the district judge concluded that Application Note 3 to §2B5.1 precluded use of that Guideline. Note 3 reads:

> Inapplicability to Genuine but Fraudulently Altered Instruments.—"Counterfeit," as used in this section, means an instrument that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety. Offenses involving genuine instruments that have been altered are covered under §2B1.1 (Theft, Property Destruction, and Fraud).

A fake that includes genuine currency paper has not been "falsely made or manufactured in its entirety", the district

court held. It is instead an altered version of a genuine instrument. Accord, *United States v. Inclema*, 363 F.3d 1177 (11th Cir. 2004).

Although the district court and the parties, like the eleventh circuit in *Inclema*, concentrated on the meaning of "in its entirety," this is a distraction. All of the elements (except hydrogen) in a counterfeit bill were forged in stars; a counterfeiter plays no role in their creation. Likewise counterfeiters purchase ink, paper, printing equipment, and the like in the market rather than fabricating their own. Thus the phrase "made . . . in its entirety" must refer not to the bill as a physical artifact (for nothing on this planet has been created "in its entirety" by a single person) but to the "instrument"—that is, to the legal or economic significance of the artifact. A person who alters the numerals on a genuine bill has tried to change the way an "instrument" operates in commerce. As such changes usually are easy to detect there is less need for the incremental deterrence that §2B5.1 supplies. But a person who grinds up genuine currency paper and makes a new batch has destroyed any "instrument" in the process and should receive a punishment greater than that meted out to someone who prints fakes on paper bought at Office Depot. So too with a person who hijacks a truck carrying genuine currency paper to the Bureau of Engraving and Printing and uses that as the substrate for his counterfeits. In the diverted-paper situation no "genuine instrument" has come into being, so Application Note 3 does not apply: genuine currency paper does not a "genuine instrument" make.

Well, is genuine currency paper derived from bills in circulation different from paper diverted before it reaches the Bureau? The answer is yes in both physical and legal senses. Bills are printed by an intaglio process under high pressure, so indentations remain even if the ink disappears. This leads to the legal difference: the Treasury Department treats bills from which all ink has been removed as currency, which it

will replace with new notes. For a description of the damaged-currency exchange process see http://www.moneyfactory.com/section.cfm/8/39. Had Schreckengost changed his mind after bleaching the $5 bills, he could have swapped them for new notes—just as someone who accidentally puts currency through a washing machine may do—because the printing impressions demonstrate the paper's provenance. Maybe if a truck carrying currency paper had been hijacked recently the Treasury would take care to ensure that the impressions came from the Bureau of Printing and Engraving, but once that determination had been made the blank would be redeemed. The federal government's willingness to treat even an erased bill as a legal obligation of the Treasury shows that the paper remains an "instrument" and vindicates the district court's decision to sentence Schreckengost under §2B1.1.

This outcome is unsettling, because it means a lower sentence for someone whose crime, being harder to detect than that of a counterfeiter who starts with plain bond paper, instead requires a higher sentence in order to preserve deterrence. Application Note 3 could not have been written with this sort of counterfeiting in mind. It is hardly likely that the Sentencing Commission devised this as a way to reward counterfeiters who gin up "only" $95 rather than $100 in extra face value per counterfeit bill; the discount is too steep, the language inapt. But the Commission did not adopt goals or objects; it promulgated a text, and like other rules this text may both overshoot the author's goals in some respects and undershoot them in others. Our job is to implement the adopted text, not the authors' (imputed) aspirations. See *Rodriguez v. United States*, 480 U.S. 522 (1987). The Sentencing Commission may deem it wise to revisit this subject. As the Application Note stands, however, counterfeiters such as Schreckengost are beneficiaries, even if accidental ones.

AFFIRMED

No. 04-1921                                          5

A true Copy:

    Teste:

 

              _____
              *Clerk of the United States Court of*
              *Appeals for the Seventh Circuit*