# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 14, 2009

Charles R. Fulbruge III
Clerk

No. 08-30045

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ALICIA A DISON

Defendant-Appellant

Consolidated with
No. 08-30108

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RYAN D WALTERS

Defendant-Appellant

No. 08-30045 c/w No. 08-30108 c/w
No. 08-30109 c/w No. 08-30196

———

Consolidated with
No. 08-30109

———

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ADAM A HARRIS

Defendant-Appellant

———

Consolidated with
No. 08-30196

———

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

GEOFFREY G VICE

Defendant-Appellant

2

No. 08-30045 c/w No. 08-30108 c/w
No. 08-30109 c/w No. 08-30196

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 5:07-CR-50072-4
USDC No. 5:07-CR-50072-2
USDC No. 5:07-CR-50072-3
USDC No. 5:07-CR-50072-1

Before SMITH and SOUTHWICK, Circuit Judges, and RODRIGUEZ, District Judge.[*]

PER CURIAM:[**]

This consolidated criminal appeal concerns the proper application of the United States Sentencing Guidelines when a defendant is convicted of bleaching the ink off of legitimate United States Federal Reserve notes and reprinting the notes in different denominations. Defendants argue that the district court erred in applying Section 2B5.1 rather than Section 2B1.1 to determine their base offense levels because they altered genuine instruments and did not falsely manufacture such instruments in their entirety. Defendants further maintain that the district court improperly enhanced their sentences under Sections 2B5.1(b)(2)(A) and (b)(3) of the Sentencing Guidelines because the notes at issue were obviously counterfeit. For the reasons that follow, we VACATE the defendants' sentences, and REMAND for resentencing.

## I. BACKGROUND

In March 2007, Louisiana State Probation and Parole agents performed a routine home inspection at a residence occupied by Geoffrey Vice and Ryan Walters. Upon searching the house, agents discovered an altered $100 bill in a chest of drawers in Walters's bedroom. Walters said that the bill belonged to his

---

[*] District Judge of the Western District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, we determine that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

brother, Adam Harris. He later confessed that he knew Vice and Harris were making counterfeit bills. In Vice's bedroom, agents also found an altered $100 bill in a purse, an HP printer, two legitimate $5 bills, and three legitimate $1 bills floating inside a peanut butter jar containing ammonia. Vice and Alicia Dison arrived during the search. Dison consented to a search of her person, and agents found an altered $100 bill in her pocket.

Agents also learned that prior to the home inspection, Harris had attempted to pass an altered note at a local McDonald's. The cashier showed the bill to the manager, who identified it as counterfeit and confiscated it. The manager knew and recognized Harris. When he told Harris that the bill was counterfeit, Harris drove away. In March 2007, police stopped Harris and found another altered $100 bill in his car. Harris admitted that he had unsuccessfully attempted to pass this bill at a Wal-Mart store. In addition to the currency found during the searches, two other counterfeit notes bearing the same serial number as the notes seized were sent to the United States Secret Service.

In August 2007, a federal grand jury returned a six-count indictment against Vice, Dison, Walters, and Harris. Along with other, substantive counterfeiting charges, each defendant was charged with one count of conspiracy to make, pass, utter, possess, and conceal counterfeit Federal Reserve notes. All defendants pled guilty to the conspiracy charge. The remaining counts in the indictment were dismissed.

At sentencing, Darron Kraft, a special agent for the United States Secret Service, testified that the defendants created the counterfeit $100 bills by soaking legitimate $1 and $5 bills in a glass jar filled with ammonia. The bills would be taken out periodically to scrub off ink. They would then be hung to dry in front of a window air conditioning unit. After the defendants removed all of the ink from the bills, they would use a printer to transfer the image of a $100

bill onto the bleached lower denomination notes. The new, altered notes retained their original watermark and security thread.

Agent Kraft also testified regarding the United States Department of Treasury's policy with respect to bleached currency. Kraft explained that there are two designations for such bills: mutilated or unfit. Damaged or worn out bills can be taken to a bank and exchanged for good currency. However, once a bill has been damaged or altered to the point that its denomination cannot be discerned, it is to be turned over to the Department of Treasury's Bureau of Engraving and Printing. The Treasury Department then determines whether the bill should be refunded at face value to the person who surrendered it. If the currency is deemed altered or questionable, it is turned over to the Secret Service for investigation. No refund is given. Finally, Kraft testified that he would consider bleached and reprinted bills to be counterfeit.

The presentence report for each defendant calculated the defendant's base offense level using Section 2B5.1(a) of the Sentencing Guidelines, enhanced by Sections 2B5.1(b)(2)(A) and (b)(3). All defendants objected to the use of Section 2B5.1 (the section generally applicable to counterfeiting offenses) rather than Section 2B1.1 (the section generally applicable to theft and fraud offenses) in calculating their base offense levels. Defendants argued that Section 2B1.1 should apply because they only altered Federal Reserve notes and did not manufacture them in their entirety. Defendants also objected to the Section 2B5.1(b)(2)(A) and (b)(3) enhancements because the bills at issue were so obviously counterfeit that they were unlikely to be accepted, even if subjected to only minimal scrutiny. The district court overruled the defendants' objections, finding the use of Section 2B5.1 appropriate. All four defendants timely appealed. Their appeals have been consolidated for our review.

## II.  DISCUSSION

Defendants contend that the district court erred in applying Section 2B5.1 to determine their base offense levels under the Sentencing Guidelines. Initially, we determine whether the district court committed any significant procedural error. *Gall v. United States*, 128 S. Ct. 586, 597 (2007).  If proedural errors were avoided, we consider the substantive reasonableness of the sentence. *Id.*  The district court's interpretation and application of the Sentencing Guidelines are reviewed *de novo.  United States v. Klein*, 543 F.3d 206, 213 (5th Cir. 2008).  Factual findings are reviewed for clear error.  *Id.*  A sentencing court's findings of fact are not clearly erroneous if they are "plausible in light of the record read as a whole."  *United States v. Williams*, 520 F.3d 414, 422 (5th Cir. 2008) (internal quotation marks and citation omitted).

Section 2B1.1 of the Sentencing Guidelines is entitled "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."  A base offense level of six applies.  The introductory comments for this section provide that it addresses "basic forms of property offenses: theft, embezzlement, fraud, forgery, counterfeiting (*other than offenses involving altered or counterfeit bearer obligations of the United States*) . . . ." (emphasis added).  The italicized phrase creates one part of the ambiguity with which we must contend.  The words "altered" and "counterfeit" are somewhat competing concepts. This heading to Section 2B1.1 excludes them both from that section when the offense concerns bearer obligations of the United States.  The parties agree that the pieces of currency at issue are bearer obligations of the United States.  On the other hand, the title to this section, which we also quoted above, excludes only "counterfeit bearer obligations of the United States," not "altered or counterfeit" as the introductory commentary states.

The other possible source for the sentence argued by the parties is Section 2B5.1. It assigns a base offense level of nine for "Offenses Involving Counterfeit Bearer Obligations of the United States." That section's Application Note 2 states that the "guideline applies to counterfeiting of United States currency and coins . . . and other items that generally could be described as bearer obligations of the United States, i.e., that are not made out to a specific payee." Application Note 3 explains that "counterfeit" means "an instrument that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety. Offenses involving *genuine instruments that have been altered* are covered under [Section] 2B1.1 (Theft, Property Destruction, and Fraud)." (emphasis added). The italicized phrase in a Note to Section 2B5.1, which references Section 2B1.1 for "altered" instruments but not counterfeit ones, contends uncertainly with the phrase we italicized from the introductory commentary to Section 2B1.1, which says it applies neither to altered nor to counterfeit instruments. If the false currency involved in this case is altered as opposed to counterfeit, neither Guideline section unambiguously welcomes the offense for sentencing.

The district court held that the bleached and reprinted notes were covered by Section 2B5.1. The court classified the notes as counterfeit bearer obligations within the title of Section 2B5.1 and the language of Application Note 2 to that section. The court found Section 2B1.1 to be inapplicable because of its introductory comments that it does not apply to "altered or counterfeit bearer obligations of the United States."

As we seek the proper Guideline, we must determine whether the search is for a Guideline that applies to instruments that are falsely manufactured in their entirety, i.e., are "counterfeit," or instead for the Guideline applicable to the alteration of currency. This false, high-denomination currency began as small-denomination bills issued by the Treasury. Through the bleaching

7

process, a relatively clean base was created on which to photocopy a bill with a much larger dollar value. Using as a base the official currency paper that continues to contain watermarks is a critical part of the similitude that the counterfeiters seek. In that physical sense, these bills were not "entirely" manufactured by the defendants. The government argues, though, that in a legal sense, these bills were entirely manufactured.

The government refers us to testimony from Secret Service Agent Kraft regarding the Department of Treasury's policy with respect to bleached currency. The testimony was that the Treasury classifies bleached bills as either mutilated or unfit. Damaged or worn out bills can be taken to a bank and exchanged for good currency. However, once a bill has been damaged or altered to the point that its denomination cannot be discerned, it is to be turned over to the Treasury Department's Bureau of Engraving and Printing. The determination is made whether the bill should be refunded at face value to the person who surrendered it. If the currency is deemed altered or questionable, it is turned over to the Secret Service for investigation; no refund is given. Agent Kraft testified that, to his knowledge, the Treasury Department does not have any reason to distinguish between bills that have been altered as opposed to manufactured in their entirety, i.e., "counterfeit" under the Guidelines.

Although we have not considered whether bleached and reprinted notes are falsely made or manufactured in their entirety or merely altered, two other circuits provide useful guidance on this issue. *See United States v. Inclema*, 363 F.3d 1177 (11th Cir. 2004); *United States v. Schreckengost*, 384 F.3d 922 (7th Cir. 2004). In *Inclema*, the defendant was convicted of a counterfeiting offense involving bleaching genuine lower-denomination bills and using a computer printer to reprint the bills in a higher denomination. 363 F.3d at 1179. The district court sentenced the defendant under Section 2B5.1. *Id*. The Eleventh Circuit vacated the defendant's sentence and remanded for sentencing under

Section 2B1.1. *Id.* The court held that "defendants who start with genuine paper currency and modify it by whatever means for the purpose of creating non-genuine currency should be sentenced under [Section] 2B1.1." *Id.* at 1182.

Relying in part on dictionary definitions, the court's essential point was that the defendant started with Federal Reserve notes and ended with Federal Reserve notes. *Id.* at 1181. The court rejected the government's argument that once the defendant bleached the notes, they became merely high-quality pieces of currency paper. *Id.* The court explained that the bleached paper was the distinct paper used by the United States Treasury to print Federal Reserve notes, the "possession of which alone without the authority of the Secretary of the Treasury is a felony." *Id.* (citation omitted).

Similarly, the Seventh Circuit held that bills that have been bleached and reprinted are altered and not counterfeit. *Schreckengost*, 384 F.3d at 924-25. That defendant had removed the ink from genuine $5 bills and "used an inkjet printer to produce facsimiles of $100 bills on the blank sheets. These fakes had the feel of currency and could pass some tests employed to identify genuine bills." *Id.* at 923. The defendant pled guilty to counterfeiting and was sentenced in accordance with Section 2B1.1. *Id.* The government appealed the defendant's sentence. *Id.* The court did not fully agree with the Eleventh Circuit's analysis, but it reached the same conclusion. *Id.* at 924. It held that the bleached and reprinted bills were altered instruments, and Section 2B1.1 applied. *Id.*

The government argues that the Seventh Circuit erred when it concluded that bleached bills retain their legal status as genuine instruments. Agent Kraft testified that the Treasury Department will not replace bills from which all of the ink has been removed. However, what the Treasury will do in the performance of its obligations is largely beside the point. Our obligation is to interpret sections of the Sentencing Guidelines that are not written in terms of whether the United States Department of the Treasury would find the changes

to actual currency so substantial as to deny its holder the right to have it replaced. Instead, we are to determine whether false currency has been manufactured by the defendant in its entirety, or whether actual currency has been altered.

We agree with these other circuits that bleached and reprinted notes are altered, not falsely made in their entirety. The reprinted bills possess many of the unique security features of genuine currency, including the embedded security thread and watermark. The notes are composed of the authentic Treasury Department paper used to print genuine Federal Reserve notes. The bleached and reprinted notes retain many of the physical and legal characteristics of their previous state and cannot be said to have been falsely made or manufactured in their entirety.

Now that we have found these bills were not manufactured in their entirety by the defendants, we need to resolve, as a matter of first impression for this circuit, which Guideline section applies to that offense. Our review of the provisions offered by the parties has not revealed a simple answer to this question. The difficulty stems primarily from an inconsistency between Application Note 3 to Section 2B5.1 and portions of the introductory and background comments to Section 2B1.1, as well as its title.

We start our effort to resolve the sentencing questions by using ordinary rules of statutory construction. Those rules apply to the interpretation of the Sentencing Guidelines. *United States v. Rabanal*, 508 F.3d 741, 743 (5th Cir. 2007). Accordingly, if the language of the Guidelines is unambiguous, the plain meaning of the language controls, and the court's inquiry ends there. *Id.* Ambiguity, though, will cause the court to look for evidence of meaning in other relevant sources. *United Sates v. Palazzo,* 558 F.3d 400, 405 (5th Cir. 2009). The commentary to a Guideline section is authoritative unless it is a plainly erroneous reading. *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see also*

U.S.S.G. § 1B1.7 ("Significance of Commentary"). We have elaborated on this exception by stating that if the Guideline text and the commentary are inconsistent, the Guidelines language controls. *United States v. Cervantes-Blanco*, 504 F.3d 576, 579 n.1 (5th Cir. 2007). We have also held, quite naturally, that in case of an inconsistency between an Application Note and Guideline language, we will apply the Guideline and ignore the Note. *United States v. Ashburn*, 20 F.3d 1336, 1340 (5th Cir. 1994).

Another location for relevant language in this case is the heading or title to Section 2B1.1. To understand the importance of titles, we search the section of the Guidelines that sets out "General Application Principles." *See* U.S.S.G. § 1B1.1. An Application Note to that section gives the formal label of "title" to a heading of a Guideline. *Id.* at cmt. n.6. This Application Note implies that the titles have significance, in that the Note makes clear that when a short-form title of a Guideline is used to identify it in a cross-reference, that shortening has no substantive effect. *Id.* Recognizing that the titles have some significance is unavoidable, as the section titles are simultaneously adopted with each Guideline section, often are key to understanding what Guideline sections cover, and are not mere compiler's additions as is the case for titles in some statutes. *See* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47:14 (7th ed. 2007). Where titles rank in the hierarchy of Guideline text, commentary, or notes is not critical for us today. We only are finding that a section title has relevance.

We now examine the different pieces of our interpretive puzzle. Application Note 3 of Section 2B5.1 defines "counterfeit" as "an instrument that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety." That Note refers to Section 2B1.1 for sentencing of offenses involving genuine but fraudulently altered instruments. Following our instructions to turn to Section 2B1.1, we there find the introductory and

11

background comments state that the Guideline does not apply to offenses involving "altered or counterfeit bearer obligations of the United States." The title, though, only excludes counterfeit bearer obligations.

The problem, then, is that Section 2B5.1 does not apply to "altered" bearer obligations of the United States, and we have found these bills to fit that description. Turning to Section 2B1.1, we discover that its title excludes counterfeit bearer obligations of the United States; presumably, altered bills such as the ones in this case would be covered. However, two other parts of the same Guideline state that both counterfeit and altered bearer obligations of the United States are excluded. Neither section unambiguously wants this offense.

The United States Sentencing Commission has recently recognized the difficulty courts face in reconciling these conflicting provisions. On January 27, 2009, the Sentencing Commission published a notice of a proposed amendment. Notice of Proposed Amendments, Sentencing Guidelines for United States Courts, 74 Fed. Reg. 4802, 4821-22 (proposed Jan. 27, 2009). Included were amendments to the Guideline provisions at issue in this case. The proposed changes will take effect (though perhaps with some changes) on November 1, 2009, unless Congress enacts a law to the contrary.

The synopsis for the relevant proposal, entitled "Counterfeiting and 'Bleached Notes,'" explains that the amendment is intended to clarify "guideline application issues regarding the sentencing of counterfeiting offenses involving 'bleached notes.'" *Id*. at 4821. It defines "bleached notes" as genuine United States currency that has been chemically stripped of its original image and reprinted to look like currency of a higher denomination. The synopsis states that circuit courts have reached different conclusions regarding whether Section 2B5.1 or Section 2B1.1 should apply to bleached notes. It cites *Schreckengost* and *Inclema* for the view that Section 2B1.1 should apply; it cites the district court decision that we are reviewing for the proposition that Section 2B5.1

should apply. "The proposed amendment resolves this circuit conflict and responds to concerns expressed by federal judges and members of Congress concerning the guidelines pertaining to offenses involving bleached notes." *Id.*

The Commission suggests that the source for the difficulty regarding bleached notes is Application Note 3 to Section 2B5.1. The Commission explains that under the definition of counterfeit in Application Note 3, "courts have had to consider whether a bleached note should be considered falsely made or manufactured in its entirety (and therefore sentenced under §2B5.1) or an altered note (and therefore sentenced under §2B1.1)." *Id.* at 4821-22. The corrective for the future is to make Section 2B5.1 apply.

> The proposed amendment resolves this issue to provide that offenses involving bleached notes are to be sentenced under §2B5.1. Specifically, the proposed amendment deletes Application Note 3 and revises the definition of "counterfeit" to more closely parallel relevant counterfeiting statutes, for example 18 U.S.C. §§ 471 (Obligations or securities of the United States) and 472 (Uttering counterfeit obligations or securities).

*Id.* at 4822.

The impact of the proposed amendment on us is limited. The amendment was not in effect at the time the defendants were sentenced. It remains ineffective. Thus, retroactive application of the changes is not an issue. More importantly, the proposed amendment and its synopsis do not take a position on the meaning of the current version of the Guidelines. The Commission merely seeks to clarify the sentencing for future cases and does not resolve the uncertainty with which we are concerned.

Faced with such ambiguity, recognized though not yet resolved by the proposed amendments to the Guidelines, "we are constrained to apply the rule of lenity in this case." *United States v. Orellana*, 405 F.3d 360, 370 (5th Cir. 2005). The rule of lenity provides that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Jones v. United States*,

13

529 U.S. 848, 858 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). Thus, "'when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Id.* (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952)). Although the proposed amendments to the Guidelines would allow Section 2B5.1 to be used in the future, the rule of lenity applies until that time. We find Section 2B1.1 to be the Guideline provision for determining the defendants' base offense levels in this case.

Because we hold that Section 2B1.1 is the appropriate starting point for calculating the defendants' Guidelines sentencing range, we need not reach the defendants' second issue on appeal, whether the Section 2B5.1(b)(2)(A) and (b)(3) enhancements were properly applied. On remand, the district court should calculate the defendants' sentences in accordance with Section 2B1.1.

## III. CONCLUSION

For the foregoing reasons, we VACATE the defendants' sentences, and REMAND for resentencing under Section 2B1.1.