# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10863

United States Court of Appeals
Fifth Circuit

**FILED**

February 21, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

VIJU MATHEW,

Defendant–Appellant.

On Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Viju Mathew pleaded guilty of knowingly possessing, with the intent to use unlawfully or transfer unlawfully, five or more authentication features (health insurance claim numbers) issued by or under the authority of the United States, in violation of 18 U.S.C. § 1028(a)(3), (b)(2)(B), and (c)(1). The district court sentenced Mathew to thirty months' imprisonment and $277,957.89 in restitution payable to Medicare. He appeals the sentence,

No. 17-10863

challenging the assessment of restitution and the calculation of the loss amount. We vacate and remand for resentencing.

I.

Mathew worked at Parkland Health and Hospital System ("Parkland") as a registration specialist, where his duties required him to access confidential patient information. He also owned a business called Dallas Home Health Care, Inc. ("DHH"). Mathew stole confidential patient information from Parkland and gave it to DHH employees to call the individuals and solicit them as patients. Mathew did not make the calls himself but instructed three of his employees to use the information to solicit prospective patients for DHH.

Based on information from a former DHH employee, authorities obtained a search warrant for DHH's office and determined DHH to be in the possession of approximately 1,300 Parkland patients' identifying information, including their health insurance claim numbers ("HICNs"). The government charged Mathew with "[o]n or about September 23, 2011," "knowingly possess[ing] with intent to use unlawfully or transfer unlawfully five or more authentication features, to wit, [HICNs], and the authentication features were or appeared to have been issued by or under the authority of the United States." *See* 18 U.S.C. § 1028(a)(3), (b)(2)(B), (c)(1) (2012).

Mathew pleaded guilty per a factual resume, without a plea agreement, and admitted that "he knowingly removed from Parkland confidential information, and intended to use the information to gain an economic benefit by contacting prospective patients by telephone that might need home health services." The government did not sign the factual resume because it disagreed with Mathew's contention that the phone calls did not successfully solicit any patients for DHH.

No. 17-10863

The following exchange occurred at rearraignment:

| | |
|---|---|
| THE COURT: | I'll call upon the Assistant United States Attorney to state the potential penalties for and consequences of pleading guilty. |
| MR. PORTUGAL: | Your Honor, the maximum penalties the Court can impose include: . . . [r]estitution to victims or to the community which may be mandatory under the law and which Mr. Mathew agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone. |
| THE COURT: | Mr. Mathew, do you understand that if you plead guilty to Count One, you are subject to all those consequences and penalties just explained to you, sir? |
| MATHEW: | Yes, ma'am. |
| THE COURT: | Do you have any questions about anything at all we've covered up to this point? |
| MATHEW: | No, not at this time. |

Mathew then pleaded guilty.

In preparing the presentence investigation report ("PSR"), investigators determined that of the approximately 1300 Parkland patients whose information DHH possessed illegally, sixteen received home health services from DHH, and "Medicare paid DHH a total of $311,445.57 relative to" the sixteen patients. The probation officer determined that the $311,445.57 was the "actual loss" and used that amount to enhance Mathew's offense level under U.S.S.G. § 2B1.1(b)(1)(G) and to assess restitution under 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1.

Mathew objected to the PSR's calculation of the loss amount, claiming that "the loss amount was zero." He also asserted that there were no victims of his conduct because "all patients were properly referred by Parkland

Hospital," "the stolen list of patients from Parkland was . . . never used," and DHH never secured any patients "from the use of the Parkland Hospital list." In response, the government contended that "anything that [DHH] billed to Medicare . . . for beneficiaries whose identifiers Mathew stole is counted as loss." Because Mathew had admitted to stealing Parkland patient information to gain an economic benefit through his business DHH, the amounts that DHH "billed for those beneficiaries is tainted by that criminality and is properly included as loss." Furthermore, there were victims of Mathew's crime because Mathew unlawfully transferred the patients' information to DHH.

The probation officer rejected Mathew's objections and accepted the government's positions. She adopted the government's theory of loss, affirming the $311,445.57 loss amount, and determined that sixteen of the 1300 Parkland patients whose information DHH possessed were properly classified as victims because Mathew used their information "without permission to solicit and recruit [them] to receive home health care from his company and he billed Medicare for these services."

Mathew filed supplemental objections to the PSR, asserting that he "must be credited with the fair market value of legitimate services provided in calculating the loss amount." First, he stated that the prosecution had maintained that only five of the sixteen identified victims did not qualify for home health services, but had not extended that contention to the other eleven victims. Second, those eleven victims "undisputedly qualified for home healthcare services," DHH provided "legitimate services" to them, and Medicare "would have paid for those services absent Mathew's compromising their identities." Consequently, Mathew was entitled to credit for the fair market value of those services in both the loss and restitution calculations. He also contended that the total actual loss amount was $105,369.86, or the amount paid by Medicare

No. 17-10863

for the five patients the government asserted were not qualified for home health services.

The government responded, asserting that Mathew had failed to meet his burden of establishing that he was entitled to a credit against the $311,445.57 loss because he failed to show that DHH provided legitimate services to the sixteen victims and that Medicare would have paid for the services provided but for Mathew's fraud. The government continued to claim that because any services DHH provided "to the victims of his identity theft were tainted by his criminal conduct from day-one, the entire amounts associated with those [sixteen victims] should be included in the loss amount."

The probation officer again rejected Mathew's supplemental objections and did not alter the loss amount. She determined that Mathew was not entitled to a credit against the loss because "the services provided by DHH [to] patients were not legitimate" and "the patients were not homebound and did not require skilled nursing services."

II.

The district court held a four-day sentencing hearing. The parties presented evidence focusing on the sixteen DHH patients whose Medicare bills the government asserted should be used to calculate actual loss for purposes of sentencing and restitution. Mathew asserted that those patients had qualified for home health care and received legitimate services, so he was entitled to a credit against the $311,445.57. Conversely, the prosecution claimed that Mathew's identity theft caused the entirety of Medicare's loss because Medicare would not have paid any of the sixteen patients' claims had it known that Mathew had compromised their identities. Furthermore, fifteen of the sixteen did not qualify for Medicare-covered home health care or did not receive Medicare-reimbursable services.

5

No. 17-10863

The district court determined that Mathew's taking of the sixteen patients' information from Parkland "wrongfully constitut[ed] identity theft" and that Mathew had failed to satisfy his burden to establish that he was entitled to a credit for legitimate services that Medicare would have paid for but for his fraud.  To determine the total restitution, the court reduced the $311,445.57 loss amount by $33,487.68, the sum Medicare had paid for two patients' care, because the government had inadvertently produced their records to Mathew late.  Thus, the court found that the net amount of loss was $277,957.89; the court used that amount to apply a twelve-level enhancement to the base offense level per U.S.S.G. § 2B1.1(b)(1)(G); it calculated Mathew's guideline range to be 30−37 months and sentenced him to 30 months' imprisonment.

The court also ordered Mathew to pay $277,957.89 in restitution to Medicare for all the care DHH had rendered to fourteen of the sixteen Parkland patients.  Mathew objected to the imposition of restitution because his offense "did not include a scheme to defraud," so "any restitution award would exceed the scope of the conviction."

On appeal, Mathew challenges the district court's assessment of restitution and its calculation of the loss amount.  First, he contends, the court improperly assessed restitution because the award included amounts for conduct beyond the offense of conviction and for conduct that occurred before the temporal scope of the indictment.  Second, the court improperly calculated the loss amount because Mathew introduced evidence that Medicare received value for the services DHH provided to the sixteen patients, and, thus, he was entitled to a credit, and because "[t]he district court's finding that fraud was endemic as to the [sixteen] patients at issue and resulted from Mr. Mathew's possession of the authentication features was based on insufficient evidence."

6

No. 17-10863

III.

"We review a restitution order's legality de novo and its amount for abuse of discretion." *United States v. Villalobos*, 879 F.3d 169, 171 (5th Cir. 2018). "[W]e review the district court's application of the guidelines *de novo* and its findings of fact at sentencing for clear error." *United States v. Klein*, 543 F.3d 206, 213 (5th Cir. 2008). The finding regarding the amount of loss is a factual finding that we review for clear error. *Id.* at 214. "There is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010) (citation omitted). We review "*de novo* how the court calculated the loss, because that is an application of the guidelines, which is a question of law." *Klein*, 543 F.3d at 214.

IV.

Mathew asserts that the restitution order was unlawful because it included amounts for Medicare payments that preceded the temporal scope of his offense of conviction. We agree.

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, "limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction. An award of restitution cannot compensate a victim for losses caused by conduct not charged in the indictment or specified in a guilty plea." *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012). Therefore, "when the subject offense involves a scheme, conspiracy, or pattern of criminal activity," *United States v. Hughey*, 147 F.3d 423, 437 (5th Cir. 1998), that is, "where [the] fraudulent scheme is an element of the conviction," *United States v. Maturin*, 488 F.3d 657, 661 (5th Cir. 2007) (emphasis and citation omitted), "restitution may be awarded to any person who is directly harmed by the defendant's course of criminal conduct," *Hughey*, 147 F.3d

7

at 437.[1]  But "[w]hen the count of conviction does not require proof of a scheme, conspiracy, or pattern, . . . the defendant is only responsible to pay restitution for the conduct underlying the offense for which he has been convicted." *Maturin*, 488 F.3d at 661 (citation and internal quotation marks omitted).  In that event, restitution cannot include "losses caused by conduct that falls outside the temporal scope of the acts of conviction." *Sharma*, 703 F.3d at 323. The district court must support "every dollar" of a restitution order with record evidence. *Id.*

Mathew's offense does not involve a scheme, conspiracy, or pattern. The indictment charged him with violating 18 U.S.C. § 1028(a)(3), (b)(2)(B), and (c)(1), which make it a crime "knowingly [to] possess[] with intent to use unlawfully or transfer unlawfully five or more . . . authentication features . . . issued by or under the authority of the United States."  The statute does not include a fraudulent scheme as an element of the offense, either in its plain language or as a judicial interpretation.  Moreover, the charge in Mathew's indictment, his factual resume's description of the elements of the offense, and the government's description of the elements of the offense at his rearraignment proceeding all mirror the language of the statute and thus do not state that Mathew's offense of conviction included a fraudulent scheme as an element of his offense.

Mathew also did not agree to enlarge the scope of restitution beyond the offense of conviction to include relevant conduct.  Though "when a defendant pleads guilty to fraud, the scope of the requisite scheme to defraud, for restitution purposes, is defined by the mutual understanding of the parties rather

---

[1] Though the *Hughey* court was interpreting the Victim and Witness Protection Act, 18 U.S.C. § 3663, *Hughey*'s reasoning "also applies to cases arising under the MVRA." *Maturin*, 488 F.3d at 661 n.2.

No. 17-10863

than the strict letter of the charging document," *United States v. Adams*, 363 F.3d 363, 364 (5th Cir. 2004), there was no mutual understanding between Mathew and the prosecution. There is no plea agreement broadening the criminal offense to encompass conduct not stated in the indictment. In the factual resume that accompanied his guilty plea, Mathew admitted only that he (1) "used his position to obtain confidential patient information, including [HICNs] that were issued by and under the authority of the United States," (2) "intended to use the information to gain an economic benefit by contacting prospective patients by telephone that might need home health services," and (3) knowingly possessed the HICNs "on or about September 23, 2011," with the intent to use them unlawfully.

Neither does Mathew's rearraignment evince an agreement between him and the government to enlarge the scope of restitution. During the rearraignment, the prosecutors explained that the maximum penalties included restitution, which "may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." Mathew stated that he understood that he was subject to that penalty if he pleaded guilty, and then proceeded to plead guilty. That "relevant conduct," however, was never defined by a mutual understanding between Mathew and the prosecution, and we will not speculate as to what it could have been.[2] Thus, Mathew's statements at rearraignment cannot serve as the justification for broadening restitution to include conduct not contained in the indictment or factual resume.

---

[2] *See United States v. Shelton*, 694 F. App'x 220, 224–25 (5th Cir. 2017) (per curiam) (explaining that "[a]bsent evidence of a *mutual* understanding as to the scope of the conspiracy," we will not look beyond the charging document); *United States v. Ashford*, 337 F. App'x 404, 405 (5th Cir. 2009) (per curiam) ("Because there is no written plea agreement in this case and no plea terms are contained in the record, we must look to the actions alleged in the charging document, rather than speculating upon the mutual understanding of the parties, to determine the scope of [the defendant's] fraudulent scheme."); *Adams*, 363 F.3d at 366–68.

Accordingly, because Mathew's offense of conviction does not involve a scheme, conspiracy, or pattern of criminal activity, and because he did not agree to enlarge the scope of restitution to include conduct not included in his indictment and factual resume, the MVRA required the district court to limit restitution to the actual loss directly and proximately caused by Mathew's offense of conviction. The restitution order, therefore, is lawful under the MVRA only if Medicare's losses were directly and proximately caused by Mathew's knowing possession of the HICNs, on or about September 23, 2011, with the intent to use them unlawfully or transfer them unlawfully.

Two cases are instructive: *United States v. Hayes*, 32 F.3d 171 (5th Cir. 1994), and *United States v. Mancillas*, 172 F.3d 341 (5th Cir. 1999) (per curiam). In *Hayes*, the defendant pleaded guilty of possession of stolen mail, namely, three credit cards, on or about a certain date. The district court ordered him to pay restitution to the credit card companies for charges he had made in the months preceding that date. We vacated, explaining that the defendant "pleaded guilty to an indictment charging him with mere possession on one day, not with conduct or a scheme that resulted in losses to any victims." *Hayes*, 32 F.3d at 172. The companies' losses arose from the unauthorized charges made using the cards, "which [the defendant] was not charged with and not convicted of." *Id.* at 172−73. Thus, because "restitution under the [MVRA] is limited to losses caused by the specific conduct that is the basis of the offense of conviction," and because "[t]he credit card companies' losses were not caused by the conduct for which [the defendant] was convicted[,] . . . the restitution . . . [was] not authorized under [the MVRA]." *Id.*

In *Mancillas*, the defendant pleaded guilty of "knowingly possessing counterfeited securities" and "knowingly possessing implements designed to make counterfeited securities with the intent that they be so used." *Mancillas*,

172 F.3d at 341. The district court ordered the defendant to pay restitution to five different check-cashing entities to whom he had passed fraudulent checks. *Id.* at 341–42. We vacated the restitution, determining that the defendant's "possession of the implements with the intent to use them in the future can in no way be said to directly and proximately have caused a previous harm, specifically, the harm to the check-cashing companies." *Id.* at 343. The restitution was therefore unlawful under the MVRA because it included losses not resulting from the conduct underlying the offense for which the defendant was convicted. Passing a fraudulent check before the date alleged in the indictment could not form the basis for the restitution award. *Id.*

*Hayes* and *Mancillas* thus counsel that, because the MVRA limits restitution to the actual loss directly and proximately caused by the offense of conviction, absent a mutual understanding between the parties to enlarge the scope of the relevant conduct, losses that occurred before the conduct contained within the offense of conviction cannot lawfully be included in a restitution order. The restitution component of Mathew's sentence included amounts for Medicare payments for claims DHH submitted both before and after September 23, 2011, the date specified in the indictment for when Mathew knowingly possessed, with the intent to use unlawfully or transfer unlawfully, the HICNs. Therefore, the restitution order included amounts for losses that were not directly or proximately caused by the conduct of which Mathew was convicted, namely, knowingly possessing, on September 23, 2011, HICNs with the intent to unlawfully use or unlawfully transfer them. It follows that under the MVRA, the court erred in including Medicare's losses incurred before then.

V.

Mathew contends that the restitution order was unlawful because it exceeded the losses directly and proximately caused by the conduct underlying

the offense of conviction.  Conversely, the government maintains that the conduct underlying the offense of conviction both directly and proximately caused Medicare's losses.  It directly caused Medicare's losses because "[b]ut-for Mathew's possession of the stolen names and Medicare numbers, none of the 16 individuals would have become patients of [DHH] and Medicare would not have paid any of the claims submitted on their behalves."  Furthermore, it proximately caused Medicare's losses because "[t]here can be no more reasonably foreseeable consequence of possessing stolen identities with the intent to gain an economic advantage than actually gaining an economic advantage by improperly using those identities as Mathew did."

The government reaches the correct result:  The conduct underlying Mathew's offense of conviction directly and proximately caused Medicare's losses.  Thus, restitution was lawful under the MVRA.

Before analyzing direct and proximate causation between Mathew's offense of conviction and Medicare's losses, we precisely define to what each term refers.  Mathew was convicted of, on or about September 23, 2011, knowingly possessing with the intent to use unlawfully or transfer unlawfully five or more HICNs that were issued by or under the authority of the United States.  Medicare's losses consisted of the amounts it paid for claims DHH submitted on or after September 23, 2011, for care rendered to the sixteen Parkland patients whose information Mathew stole from Parkland.

First, Mathew's offense of conviction directly caused Medicare's losses.  "A person is directly harmed by the commission of a[n] . . . offense where that offense is a but-for cause of the harm." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011).  Without Mathew's knowingly possessing with the intent to use unlawfully or transfer unlawfully the sixteen patients' HICNs, DHH would not have been able to submit payment claims, and Medicare would not have

12

suffered losses related to those patients' care.[3] Thus, but-for Mathew's offense of conviction, Medicare would not have suffered losses.

Second, the offense of conviction proximately caused Medicare's losses. "A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." *Id.* Mathew knowingly possessed the sixteen patients' HICNs with the intent to use them unlawfully or transfer them unlawfully. He further admitted, in the factual resume accompanying his guilty plea, that he "intended to use the information to gain an economic benefit." It is reasonably foreseeable that Medicare would suffer losses in the form of paying claims for the sixteen Parkland patients as a result of Mathew's knowingly possessing their HICNs with the intent to use those HICNs unlawfully (to gain an economic benefit). After all, the very purpose of a health insurance claim number is to identify an individual as a Medicare beneficiary, so it is unsurprising that Mathew would fraudulently use them for that purpose. Therefore, because Medicare's losses were a reasonably foreseeable consequence of Mathew's offense of conviction, that offense of conviction proximately caused those losses.

This court has addressed direct and proximate causation in the context of a restitution order. In *United States v. Espinoza*, 677 F.3d 730 (5th Cir. 2012), the defendant pleaded guilty of being a felon in possession of a firearm. *Id.* at 731. The district court ordered the defendant to pay restitution to a pawn shop to which he had sold stolen firearms that he unlawfully possessed.

---

[3] If Mathew lawfully possessed the patients' information on September 23, 2011, then any legitimate claims submitted by him using that information would have been lawful and would not have caused Medicare loss. The district court, however, determined that the sixteen Parkland patients became DHH patients "only because of the theft o[f] their identities from Parkland." Therefore, Mathew's possession of the patients' information was tainted from the time he stole it from Parkland, and the fact that those patients became DHH patients did not make Mathew's possession lawful.

No. 17-10863

*Id.* We vacated the sentence, in part because the defendant's possession of the firearms, without more, was not a but-for cause of the pawn shop's harm. *Id.* at 733–34. There was nothing inherent in the unlawful possession that would make one foresee the financial harm to the pawn shop. *Id.*

*Espinoza* is distinguishable because the defendant was convicted of mere possession with no additional element of an intent to use or transfer. Conversely, Mathew was convicted of knowing possession of the patients' HICNs with the intent unlawfully to use or transfer them. Thus, *Espinoza*'s holding regarding mere possession does not foreclose the conclusion that Mathew's knowingly possessing with the intent unlawfully to use or transfer the HICNs directly and proximately caused Medicare's losses. It follows that the restitution component of Mathew's sentence was lawful under the MVRA.[4]

VI.

Mathew asserts that the government failed to meet its burden of establishing Medicare's loss amount because the prosecution's evidence was insufficient. The government points to its witness at sentencing, who showed that Medicare would not have paid the claims DHH submitted for the sixteen Parkland patients had it known that Mathew had compromised their identities. Mathew's claim is unavailing. The government satisfied its burden to establish Medicare's loss amount by proffering evidence demonstrating that Medicare paid claims DHH submitted for the sixteen Parkland patients and would not have done so had it known that Mathew had compromised their identities. The government established an actual loss to Medicare.

Under U.S.S.G. § 2B1.1(b)(1), "[t]he amount of loss resulting from [a]

---

[4] Though imposition of restitution was lawful, as explained in part IV, the district court on remand must limit the restitution amount to Medicare's actual losses incurred on or after September 23, 2011.

14

fraud offense is a specific offense characteristic that increases the base offense level." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011). "Generally, it is the government's burden to show by a preponderance of the evidence the amount of loss attributable to fraudulent conduct." *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013). The district court "need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. 3(C), based on available information, *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007). Furthermore, given the district court's "unique position to assess the evidence and estimate the loss" amount, its "loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. 3(C); *see also United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012).

The loss resulting from an offense is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). An "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. 3(A)(i). "Reasonably foreseeable pecuniary harm," in turn, is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1 cmt. 3(A)(iv). An "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.* § 2B1.1 cmt. 3(A)(ii). Whether the loss is actual or intended, the court must reduce that loss by "the fair market value of the property returned and the services rendered . . . to the victim before the offense was detected." *Id.* § 2B1.1 cmt. 3(E)(i).

The government sought to establish that Medicare suffered an actual loss. Therefore, to have met its burden to demonstrate that actual loss, the prosecution must have shown that Medicare suffered pecuniary harm[5] that

---

[5] Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1 cmt. 3(A)(iii).

Mathew knew or, under the circumstances, reasonably should have known was a potential result of his knowingly possessing with the intent to use unlawfully or transfer unlawfully the sixteen Parkland patients' HICNs. The government satisfied that burden.

First, the government established that Medicare suffered pecuniary harm. It proffered evidence that Medicare paid claims that DHH submitted for the sixteen patients, thereby suffering a monetary loss.

Second, the government proved that Mathew knew, or under the circumstances reasonably should have known, that Medicare's pecuniary harm was a potential result of his knowingly possessing with the intent to use unlawfully or transfer unlawfully the sixteen patients' HICNs. The government proffered evidence that Medicare would not have paid the claims of the sixteen patients had it known that Mathew had compromised their identities. That evidence showed that Medicare's loss was a potential result of Mathew's offense of conviction. Mathew's knowingly possessing with the intent to use unlawfully or transfer unlawfully the patients' HICNs meant that their identities were compromised, and, therefore, that Medicare would not have paid for claims DHH submitted to Medicare for those patients if Medicare had known of the compromise.

The evidence also showed that Mathew reasonably should have known, under the circumstances, that Medicare's harm was a potential result of his offense of conviction. Again, Medicare would not have paid for the sixteen patients' claims had it known that Mathew had compromised their identities, and Mathew reasonably should have known that his intent to use unlawfully or transfer unlawfully the patients' HICNs could cause Medicare to pay for claims it otherwise would not have. Mathew reasonably should have known that his unlawfully knowingly possessing with the intent to use unlawfully or

No. 17-10863

transfer unlawfully the HICNs, whose purpose is to identify an individual as a legitimate Medicare beneficiary, could cause pecuniary harm to Medicare, the issuer of those HICNs.

The government therefore established an actual loss to Medicare. It presented evidence to demonstrate each facet of an actual loss, so restitution in that amount (less the actual losses incurred before September 23, 2011) is appropriate under the MVRA.

VII.

Mathew claims that the district court's findings regarding Medicare's actual loss amount were erroneous because he was entitled to an offset for providing legitimate services. He asserts that he presented evidence establishing that DHH provided legitimate services to the sixteen Parkland patients and that Medicare received value for those services. Conversely, the government maintains that Mathew was not entitled to an offset because he failed to demonstrate both that DHH "provided legitimate services to the 16 patients at issue" and "that Medicare would have paid for those services 'but for' Mathew's fraud." Mathew's contention is unpersuasive. Because the district court's finding is plausible in light of the record as a whole, it did not clearly err in denying Mathew an offset against the actual loss amount for providing legitimate services.

In the context of health care fraud, a defendant, to be entitled to an offset against an actual loss amount for purposes of restitution, must establish (1) "that the services [he provided to Medicare beneficiaries] were legitimate" and (2) "that Medicare would have paid for those services but for his fraud." *United States v. Mahmood*, 820 F.3d 177, 194 (5th Cir. 2016). The defendant has the burden of proof to establish each of these factors. *Id.* If he satisfies

17

that burden, the government can rebut with additional evidence. *See id.* Consequently, to have satisfied the *Mahmood* two-factor test, Mathew must have presented unrebutted evidence demonstrating (1) that DHH provided legitimate services to the sixteen Parkland patients and (2) that Medicare would have paid for those services but for Mathew's fraud. Mathew fails at the first factor.

Mathew presented medical documents, patient interviews, and witness testimony to establish that DHH provided services to the sixteen patients, that doctors had referred them for home health care, and that the patients were homebound. For example, the transcript of one patient interview stated that DHH provided "home health services." Other documents showed that some patients, at some point, had received home health care referrals from physicians who were not under suspicion for health care fraud.

The government presented evidence that discredited Mathew's claims and significantly weakened his attempt to satisfy his burden of proving that DHH had provided legitimate services to the sixteen patients. The government explained that the claims DHH submitted for fifteen of the sixteen were fraudulent as a result of a combination of (1) those patients' not being eligible for Medicare-covered home health care, (2) their not receiving Medicare-covered services as billed, (3) home health care's not being initiated by a physician, and/or (4) DHH's exaggerating the patient's health problems to increase the amount that Medicare would pay for that patient's care. For example, for one patient, DHH did not provide her skilled nursing services covered by Medicare but merely checked her vital signs. Another patient rode the bus to some of her doctor appointments, strongly indicating that she was not homebound. For each of Mathew's points regarding legitimate services, the prosecution methodically proffered evidence for each of the fifteen patients at issue that undercuts

Mathew's contentions and supports the opposite.

With both Mathew's and the government's evidence before it, the district court found that Mathew had not met his burden to demonstrate that DHH provided legitimate services to the sixteen Parkland patients, and, therefore, that he was not entitled to an offset against the actual loss amount for purposes of restitution. Mathew could not satisfy the first factor of *Mahmood*. Because the court's finding is plausible in light of the record as a whole, especially considering the detailed evidence the government presented regarding the illegitimacy of the services DHH rendered to the sixteen patients, the court did not clearly err in denying an offset against the actual loss amount for restitution purposes.

The judgment of sentence is VACATED and REMANDED for resentencing. We make no suggestion as to what decisions the district court should make on remand.