# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2023

Lyle W. Cayce
Clerk

No. 22-10103

United States of America,

*Plaintiff—Appellee,*

*versus*

Steven Anthony Reinhart,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-CR-6-1

Before Higginbotham, Graves, and Douglas, *Circuit Judges*.
Per Curiam:

Steven Anthony Reinhart ("Reinhart") pleaded guilty, with a plea agreement, to one count of misprision of a felony, 18 U.S.C. § 4, to wit: wire fraud, 18 U.S.C. § 1343. Because of the substantial assistance that he provided the government, the district court sentenced him below the guidelines range to six months of imprisonment. The district court also ordered Reinhart to pay $40,254,297.72 in restitution, jointly and severally with other defendants, pursuant to the Mandatory Victims Restitution Act ("MVRA").

No. 22-10103

Reinhart now appeals the district court's restitution order. The government moved to dismiss the appeal as barred by Reinhart's appeal waiver; that motion was carried with the case, and the case was fully briefed on the merits. We hold that Reinhart's appeal fits within an exception to his appeal waiver and, on the merits, we VACATE the restitution order and REMAND for the district court to conduct further fact finding and to adjust the award, if necessary.

## I.

Reagor Dykes Auto Group ("RDAG") owned multiple automobile dealerships in West Texas. In 2014, Reinhart was hired as RDAG's Legal and Compliance Director. RDAG financed its inventory through a "floor plan," which is the industry term used to describe a loan taken out by a dealership to purchase its vehicle inventory. Ford Motor Credit Company ("FMCC") was the floor plan lender for six RDAG dealerships. FMCC became the lender for one dealership beginning in 2008—prior to when Reinhart's employment began—and became the lender for the other five dealerships in 2014 and 2015, during Reinhart's period of employment.

RDAG was undercapitalized and had financial problems. Under the terms of the floor plan agreement, RDAG had seven days to pay FMCC after a consumer purchased a vehicle financed through the floor plan. At some point, RDAG began to regularly violate the terms of the floor plan agreement by intentionally not paying FMCC within the required seven days, which was referred to as "selling vehicles out of trust." To cover up the out-of-trust sales, RDAG employees—including Reinhart—created falsified paperwork, referred to as "dummy shucks," prior to being audited to make it appear that vehicles had only recently been sold and were therefore not "out of trust." The falsified paperwork was given to auditors hired by FMCC. Providing falsified paperwork to the auditors created a new problem for RDAG,

however, because the dates on the falsified paperwork represented to FMCC that RDAG owed large payments in the days after floor plan audits—payments that RDAG did not have the capital on hand to cover.

Reinhart helped with audits four times a year at one of RDAG's dealerships and witnesses told investigators that he dealt with the auditors. Reinhart admitted that he knew RDAG was "selling vehicles out of trust" and that he helped conceal this fraud by falsifying paperwork and providing auditors with falsified sales dates. In addition, witnesses confirmed with investigators that Reinhart was aware of the fraud and knew that false information was being provided to FMCC.

Apart from selling vehicles out of trust, RDAG employees also submitted false information to FMCC to acquire new floor plan funding. For example, RDAG submitted information for vehicles that had already been sold months or years before, a practice referred to as "re-flooring," "fake flooring," or "dummy flooring." At one dealership, RDAG ran out of vehicles to re-floor, so it submitted another dealership's inventory—which was already floored with another company—to FMCC, a practice referred to as "double flooring." Reinhart did not participate in these additional floor plan fraud schemes.

In June and July 2018, FMCC discovered the fraud. At a surprise audit, RDAG was unable to produce approximately $40.4 million worth of collateralized inventory. In August 2018, the RDAG dealerships filed for bankruptcy. Criminal charges followed. As of February 2021, after limited recovery and liquidation of assets, the total loss to FMCC was $40.2 million across six RDAG dealerships.

After the scheme was exposed, Reinhart cooperated with the government in the investigation and prosecution of other RDAG employees. In return, the government agreed to allow Reinhart to plead guilty to

misprision of wire fraud and to not prosecute him for any other offense. In his plea agreement, Reinhart acknowledged that his sentence could include "restitution to victims . . . which is mandatory under the law, and which the defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." Relevant here, he also agreed to waive the right to appeal an "order of restitution . . . in an amount to be determined by the district court," but reserved the right to "to bring a direct appeal of . . . a sentence exceeding the statutory maximum punishment."

According to Reinhart's Presentence Report ("PSR"), RDAG's floor plan fraud—including sales out of trust, fake flooring, re-flooring, and double flooring—caused a $40.2 million total loss to FMCC. Based on that loss amount, plus Reinhart's acceptance of responsibility and lack of criminal history, his guidelines range was 21 to 27 months of imprisonment. The PSR also recommended that Reinhart be ordered to pay restitution to FMCC in the amount of the loss, jointly and severally with other RDAG defendants, pursuant to the MVRA, 18 U.S.C. § 3663A.

Reinhart objected to the loss amount and the restitution amount. He contended that (1) he only pleaded guilty, as reflected in his factual resume, to participating in the out-of-trust scheme by falsifying sales paperwork and submitting it to auditors, and he did not know, nor could have foreseen, that other RDAG employees were engaging in fake flooring, re-flooring, and double flooring, and (2) to the extent any of the losses occurred before he began working at RDAG in March 2014, they were not caused by him. Therefore, he argued, he should only be held accountable for losses caused by "selling vehicles out of trust" after March 2014 and not for the full array of floor plan-related fraud.

No. 22-10103

The district court overruled Reinhart's objections and adopted the PSR's loss amount and restitution recommendation. The district court then sentenced Reinhart below the guidelines range to six months of imprisonment and ordered him to pay $40,254,297.72 in restitution to FMCC, jointly and severally with his RDAG co-defendants, pursuant to the MVRA. Reinhart filed a timely notice of appeal.[1]

## II.

Before proceeding to the merits, we must first consider Reinhart's appeal waiver. We review *de novo* whether an appeal waiver bars an appeal. *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002). "The right to appeal a conviction and sentence is a statutory right, not a constitutional one, and a defendant may waive it as part of a plea agreement." *Id.* "To determine whether an appeal of a sentence is barred by an appeal waiver," we analyze "(1) whether the waiver was knowing and voluntary and (2) whether the waiver applies to the circumstances at hand, based on the plain language of the agreement." *United States v. Bond*, 414 F.3d 542, 544 (5th Cir. 2005) (citations omitted). "We must interpret the plea agreement like a contract, in accord with what the parties intended." *Id.* at 545. "In determining whether a waiver applies, this court employs ordinary principles of contract interpretation, construing waivers narrowly and against the Government." *United States v. Keele*, 755 F.3d 752, 754 (5th Cir. 2014) (citing *United States v. Palmer*, 456 F.3d 484, 488 (5th Cir. 2006)). Reinhart does not dispute that his waiver was knowing and voluntary but asserts that his challenge fits within the exception to his appeal waiver reserving the right

_____

[1] Reinhart was released September 24, 2022. In his opening brief, he abandoned his challenge to the loss amount insofar as it impacted his guidelines range as moot, while continuing to challenge his restitution order.

No. 22-10103

to appeal a sentence exceeding the statutory maximum punishment. We agree.

"A defendant who has waived his right to appeal may still challenge a restitution order that exceeds what is authorized by statute." *See United States v. Chem. & Metal Indus., Inc.,* 677 F.3d 750, 752 (5th Cir. 2012) ("*C&MI*") (no bar to challenge where defendant's appeal waiver expressly reserved the right to appeal a sentence in excess of the statutory maximum); *United States v. Kim*, 988 F.3d 803, 809 (5th Cir. 2021) (no bar to challenge where defendant's appeal waiver did not expressly reserve his right to appeal a sentence in excess of the statutory maximum), *cert. denied*, 142 S. Ct. 225 (2021)." A district court can order restitution only "when authorized by statute." *United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020) (quoting *United States v. Espinoza*, 677 F.3d 730, 732 (5th Cir. 2012)). "[T]he term 'statutory maximum' in an appeal waiver means 'the upper limit of punishment that Congress has legislatively specified for violations of a statute.'" *Bond*, 414 F.3d at 546 (quoting *United States v. Cortez*, 413 F.3d 502, 503 (5th Cir. 2005)). We, therefore, begin our analysis by considering the relevant statute.

In this case, the district court awarded restitution pursuant to the MVRA, which requires restitution for certain offenses—including offenses against property committed by fraud or deceit, like Reinhart's—"in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.*

6

§ 3663A(a)(2). Thus, the statute "limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction." *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012); *see also id.* ("An award of restitution cannot compensate a victim for losses caused by conduct not charged in the indictment or specified in a guilty plea, or for losses caused by conduct that falls outside the temporal scope of the acts of conviction." (citations omitted)). In other words, the "actual loss directly and proximately caused by the defendant's offense of conviction," *id.*, is "the upper limit of punishment that Congress has legislatively specified" in the MVRA. *Bond*, 414 F.3d at 546 (quotation and citation omitted).

Reinhart's claim that the district court ordered restitution for losses that were *not* caused by his "offense of conviction" is an argument that the district court awarded restitution in excess of that authorized by the MVRA and is therefore not barred by his appeal waiver. *Sharma*, 703 F.3d at 323; *see also United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) ("A defendant sentenced under the [MVRA] is only responsible for paying restitution for the conduct underlying the offense for which he was convicted.").

The government counters that Reinhart waived his right to appeal the district court's exercise of discretion in ordering restitution. According to the government, the MVRA "vests the district court with discretion to determine the value of any property lost as a result of the offense," *see* 18 U.S.C. § 3663A(b)(1)(B), and Reinhart, in his plea agreement, waived his right to appeal an "order of restitution . . . in an amount to be determined by the district court"; therefore, in this case "the 'upper level of punishment' under the MVRA is the lost 'value' *as determined by the district court*." This argument relies on a misunderstanding of the MVRA.

The MVRA grants district courts discretion in calculating the value of a victim's lost property to ensure that the victim is properly compensated for

actual loss. *See* 18 U.S.C. § 3663A(b)(1)(B). But the district court does not have authority to order restitution *at all* unless the loss was "directly and proximately caused by the defendant's offense of conviction." *Sharma*, 703 F.3d at 323; *see* 18 U.S.C. § 3663A(a)(1)-(2) (authorizing "restitution to the victim *of the offense*," meaning "a person directly and proximately harmed as a result of the commission *of an offense*" (emphasis added)); *see also* § 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim *as a result of the offense* shall be on the attorney for the Government." (emphasis added)). Here, Reinhart is not challenging the district court's valuation of the loss but its authority to award restitution for that loss in the first place.

Additionally, the government contends that Reinhart agreed to "expand [his] restitution obligations" because Paragraph 3 of his plea agreement stated that his sentence could include "restitution to victims . . . which is mandatory under the law, and which the defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." *See* § 3663(a)(3) (providing that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement").

For support, the government cites *United States v. Meredith*, 52 F.4th 984 (5th Cir. 2022), but that case is distinguishable for at least two reasons. First, as the court in *Meredith* noted, restitution in that case was not awarded pursuant to the MVRA because the defendant was not convicted of an MVRA-covered offense. *Id.* at 987 n.1. Second, and perhaps more importantly, the defendant in *Meredith* contended that the statutory-maximum exception "authorizes an appeal whenever the defendant thinks the district court erred in its restitution calculation." *Id.* at 987. We rejected this argument and enforced the appeal waiver because "the statutory-maximum carveout authorizes an appeal only when the district court exceeds

No. 22-10103

'the upper limit of punishment that Congress has legislatively specified for violations of a statute'—*not* when the sentencing judge commits any error under the sentencing statute." *Id.* (quoting *Bond*, 414 F.3d at 546). Unlike the defendant in *Meredith*, Reinhart is challenging the district court's restitution order as exceeding that upper limit, rather than asserting a mere error in restitution calculation within that limit. *Id.*

In sum, Reinhart's argument that the district court awarded restitution for losses caused by conduct not encompassed by his offense of conviction or by conduct specified in his guilty plea, and for losses that pre-date his involvement with RDAG, is a statutory-maximum challenge.

**III.**

Turning to the merits, typically "[w]e review the quantum of an award of restitution for abuse of discretion." *Sharma*, 703 F.3d at 322. "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008) (quotations marks and citation omitted). "A district court's fact-finding as to the amount of restitution under the MVRA is reviewed for clear error." *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Mathew*, 916 F.3d 510, 516 (5th Cir. 2019) (quoting *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010)). However, "[w]e review *de novo* whether a sentence exceeded the statutory maximum." *C&MI*, 677 F.3d at 752.

As recited above, the MVRA "limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction." *Sharma*, 703 F.3d at 323. "An award of restitution cannot compensate a victim for losses caused by conduct not charged in the indictment or specified in a guilty plea, or for losses caused by conduct that falls outside the temporal

9

scope of the acts of conviction," and "every dollar must be supported by record evidence." *Id.* (citation omitted). "A person is directly harmed by the commission of a[n] . . . offense where that offense is a but-for cause of the harm." *Mathew*, 916 F.3d at 519 (quoting *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011)) (alteration in original). "A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." *Id.* (quoting *In re Fisher*, 640 F.3d at 648).

On appeal, Reinhart asserts that the restitution award exceeds the statutory maximum because the district court did not determine whether the award included amounts for losses that occurred before he began working for RDAG. We agree. "An award of restitution cannot compensate a victim . . . for losses caused by conduct that falls outside the temporal scope of the acts of conviction," and "every dollar must be supported by record evidence." *Sharma*, 703 F.3d at 323; *see also* 18 U.S.C. § 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."). Those exacting standards were not satisfied on this record.

FMCC became the floor plan lender for one RDAG dealership in 2008 and for another five dealerships in 2014 and 2015. Reinhart began working for RDAG in March 2014. But it is not clear when the fraud at RDAG began or when Reinhart began participating in the fraud. The PSR is silent as to both questions, while the information and Reinhart's factual resume merely recite that the offense began "on or about a date unknown." The PSR included a total purported loss amount for each dealership, but without specifying when the conduct causing the losses occurred. The PSR then subtracted approximately $5 million from the loss amount to account for asset recovery and liquidation sales to come to a "total loss" of $40.2 million, but without specifying what losses were recouped. Thus, we cannot discern from the record evidence if the restitution order impermissibly included

amounts for losses that were caused by conduct that occurred prior to Reinhart's offense, the amount of any such losses, and whether such losses were recouped or not.

Pursuant either to the MVRA's limitations or United States Sentencing Guidelines' (U.S.S.G.) principles of relevant conduct, Reinhart cannot be ordered to pay restitution for losses caused by the conduct of others that occurred prior to the commencement of *his* offense. Therefore, we must vacate and remand for the district court to conduct further fact finding on the temporal scope issue and to adjust the restitution award accordingly, if necessary.[2]

Reinhart also asserts that the restitution award exceeds the statutory maximum because it includes losses caused by conduct outside the scope of his guilty plea and offense of conviction, for losses that he did not cause and could not have foreseen. The district court noted that there were "multiple schema" at play (including sales out of trust, dummy shucks, re-flooring, fake flooring, and double flooring) under the broader umbrella of floor plan fraud but determined that "the concepts intersect and intertwine" and that the plea agreement and the Sentencing Guidelines' principles of "relevant conduct" applicable to "jointly-undertaken criminal activity" supported a restitution award for the full amount.

According to Reinhart, his offense of conviction was limited to concealment of selling of vehicles out of trust and did not include concealment of the additional floor plan fraud schemes. Therefore, he argues that he should only be held responsible for losses caused by concealing the

---

[2] Even applying the broader concept of "relevant conduct" contained in the Sentencing Guidelines, a defendant in a "jointly undertaken criminal activity" is not liable for the conduct of others that occurred prior to when he joined in the activity. U.S.S.G. § 1B1.3 cmt. n.3(B).

sale of vehicles out of trust.  The government maintains that Reinhart's offense directly and proximately caused the full floor plan loss.  Further, according to the government, Reinhart admitted in his factual resume that he participated in a broader "scheme" to defraud, not limited to selling vehicles out of trust, and agreed in his plea to pay restitution for all "relevant conduct," which includes the full scope of floor plan fraud.

We disagree with the government's reading of the plea agreement and factual resume.  Reinhart pleaded guilty to one count, contained in an information, of misprision of a felony—wire fraud—in violation of 18 U.S.C. § 4.  The information stated that Reinhart, "having knowledge of the actual commission of a felony . . . wire fraud, a violation of 18 U.S.C. § 1343, did conceal the same by providing auditors with false sale dates on buyer orders."  The information did not otherwise define what constituted the underlying "wire fraud."

In his factual resume, Reinhart admitted that he participated with others in a wire-fraud "scheme" to deceive FMCC and unlawfully enrich RDAG, himself, and others.  The factual resume, however, also repeatedly described the underlying wire fraud scheme as "selling vehicles out of trust." In pertinent part, the factual resume stated that "selling vehicles out of trust constituted a violation of the wire fraud statute, 18 U.S.C. § 1343"; that "Reinhart knew that RDAG was selling vehicles out of trust"; that "[t]o conceal the fact that RDAG was selling vehicles out of trust, in violation of 18 U.S.C. § 1343, Reinhart provided auditors . . . with false sales date on buyer orders to make FMCC and its auditors believes that such vehicles were not being sold out of trust"; that "[s]uch active concealment constituted a violation of the misprision statute, 18 U.S.C. § 4"; and that "[n]ot only did Reinhart have knowledge of the wire fraud described above (i.e. selling vehicles out of trust), but he also failed to notify an authority as soon as possible of the fact that RDAG was selling vehicles out of trust."

No. 22-10103

Aside from selling vehicles out of trust, the information and factual resume do not refer to any other fraudulent floor plan scheme, yet the district court appeared to give the factual resume and plea agreement the same expansive reading as the government and concluded that Reinhart was a participant in a jointly undertaken criminal activity constituting the entire floor plan fraud.  That was error.  *See United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993) (explaining that "mere knowledge that criminal activity is taking place is not enough" for a finding of jointly undertaken criminal activity; instead, "the government must establish that the defendant agreed to jointly undertake criminal activities with the third person, and that the particular crime was within the scope of that agreement").   As the commentary to the Sentencing Guidelines explain:

> [T]he scope of the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant.   In order to determine the defendant's accountability for the conduct of others . . . the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).  In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.   Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity.  Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct[.]

U.S.S.G. § 1B1.3 cmt. n.3(B).

Here, as it was described in the factual resume, Reinhart agreed to jointly undertake the concealment of sales out of trust by providing false sales

dates to auditors; therefore, the subsequent floor plan fraud carried out by other RDAG employees (i.e. fake flooring, re-flooring, and double flooring) is not relevant conduct because those schema do not fall within the scope of concealment of sales out of trust. The upshot is that the factual resume and the plea agreement's reference to "relevant conduct" cannot support a restitution order for the full amount of the floor plan fraud. Rather, pursuant to the MVRA, Reinhart can only be held responsible for the "actual loss directly and proximately caused by [his] offense of conviction." *Sharma*, 703 F.3d at 323. We leave it to the district court on remand to make any additional factual findings necessary to determine the amount of restitution statutorily authorized by the MVRA and to enter a new restitution order in that amount.

*     *     *

For the foregoing reasons, we VACATE the restitution order and REMAND for recalculation of restitution consistent with this opinion.